

David Rosenfeld
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————
SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

        -against-

GALLEON MANAGEMENT, LP,
RAJ RAJARATNAM,
RAJIV GOEL,
ANIL KUMAR,
DANIELLE CHIESI,
MARK KURLAND,
ROBERT MOFFAT,
  and
NEW CASTLE FUNDS LLC,

                              Defendants.
——————————————————————————

09 Civ. _____

**COMPLAINT**

        Plaintiff Securities and Exchange Commission (the "Commission") for its

Complaint against defendants Galleon Management, LP ("Galleon"), Raj Rajaratnam

("Rajaratnam"), Rajiv Goel ("Goel"), Anil Kumar ("Kumar"), Danielle Chiesi ("Chiesi"),

Mark Kurland ("Kurland"), Robert Moffat ("Moffat"), and New Castle Funds LLC

("New Castle") alleges as follows:

## SUMMARY

1.    This case involves widespread and repeated insider trading at two prominent hedge funds, Galleon, a multi-billion dollar New York hedge fund complex founded and controlled by Rajaratnam, and New Castle. The sources of the inside information include Goel, a managing director at Intel Corporation ("Intel"), Kumar, a director at McKinsey & Co. ("McKinsey"), Moffat, a senior executive at IBM, as well as executives and consultants at other well known companies. The inside information concerned market moving events such as quarterly earnings announcements, takeovers, and material contracts. The scheme generated over $25 million in illicit profits.

2.    The unlawful trading involved inside information concerning 10 different companies, including Google, Inc. ("Google"), Hilton Hotels Corporation ("Hilton"), and Intel. Specifically:

(i)    A Polycom, Inc. ("Polycom") senior executive tipped an individual ("Tipper A") to material nonpublic information about Polycom's Fourth Quarter ("Q4") 2005 and Q1 2006 earnings. Tipper A traded on that information and, in turn, tipped Rajaratnam who traded on behalf of Galleon based on that information.

(ii)    A Moody's rating agency analyst tipped Tipper A to material nonpublic information about the impending takeover of Hilton by The Blackstone Group. Tipper A traded on the information and also tipped Rajaratnam who traded on behalf of Galleon based on that information.

(iii)    An employee at Market Street Partners, a consulting firm, tipped Tipper A to material nonpublic information about Google's Q2 2007 earnings.

Tipper A traded on the information and also tipped Rajaratnam who traded on behalf of Galleon based on that information.

(iv)    Goel provided Rajaratnam with material nonpublic information about Intel's Q4 2006, Q1 2007 and Q3 2007 earnings, and Rajaratnam traded on behalf of Galleon based on that information.

(v)    Goel also provided Rajaratnam material nonpublic information about a pending joint venture involving Clearwire Corporation ("Clearwire") and Sprint Nextel Corporation ("Sprint").  Rajaratnam traded on behalf of Galleon based on that information.

(vi)    As payback for Goel's Intel and Clearwire tips, Rajaratnam traded in Goel's personal account on the basis of material nonpublic information concerning PeopleSupport, Inc. ("PeopleSupport"), which was acquired by Aegis BPO Services Ltd.  Rajaratnam also traded in Goel's personal account on the basis of material nonpublic information about the impending takeover of Hilton, as additional payback for Goel's tips.

(vii)    Kumar provided Rajaratnam material nonpublic information about Advanced Micro Devices Inc.'s ("AMD") pending transactions with two Abu Dhabi sovereign entities, and Rajaratnam traded on behalf of Galleon based on that information.

(viii)    An Akamai Technologies, Inc. ("Akamai") executive tipped Chiesi to material nonpublic information about Akamai's Q2 2008 earnings. Chiesi then shared this information with Kurland, and Chiesi and Kurland traded on that information on behalf of New Castle.  Chiesi

3

also tipped Rajaratnam and Galleon, who also traded on the basis of that information.

(ix)    Moffat tipped Chiesi to material nonpublic information about Sun Microsystems, Inc.'s ("SUN") Q2 2009 earnings. Chiesi traded on behalf of New Castle on the basis of that information. Moffat also tipped Chiesi to material nonpublic information about IBM's fiscal quarters ending December 2008 and March 2009, and Chiesi traded on behalf of New Castle on the basis of that information. Finally, Moffat tipped Chiesi to material nonpublic information about AMD's pending transactions with two Abu Dhabi sovereign entities, and Chiesi traded on behalf of New Castle on the basis of that information.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

3.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all profits realized or losses avoided from the unlawful insider trading activity set forth herein, and civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. The Commission also brings this action pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] for civil penalties against the Defendants under the Insider Trading and Securities Fraud Enforcement Act of 1988. In addition, the Commission seeks an order

barring Goel and Moffat from acting as officers or directors of any issuer that has a class

of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or

that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §

78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and for such other relief as the

Court may deem appropriate.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to Sections 20(b),

20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and

Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and

78aa].

5.    Venue lies in this Court pursuant to Sections 20(b) and 22(a) of the

Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21A and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u-1 and 78aa].  Certain of the acts, practices,

transactions and courses of business alleged herein occurred within the Southern District

of New York.  Defendant Rajaratnam lives in New York, New York and works out of

Galleon's New York, New York headquarters.  In addition, many of the communications

in furtherance of the insider trading alleged herein were made from, to, or within the

Southern District of New York.

## DEFENDANTS

6.    **Galleon,** a Delaware limited partnership, is a registered investment

adviser based in New York, New York, that, as of March 2009, had over $2.6 billion

under management.  Galleon was founded in 1997 and serves as the investment adviser

for several hedge funds, including, among others, the Technology Offshore Fund, Technology Partners Fund, Technology MAC Fund, and the Diversified Fund (collectively, the "Galleon Tech funds").

7.    **Rajaratnam,** age 52, resides in New York, New York. Rajaratnam is the founder and a Managing General Partner of Galleon, and serves as the Portfolio Manager of the Galleon Tech funds. Prior to founding Galleon, Rajaratnam worked at a registered broker-dealer for 11 years, at which time he held Series 7 and Series 24 securities licenses. Rajaratnam obtained a degree from the University of Sussex, England, in 1980, and an MBA in Finance from the Wharton School of the University of Pennsylvania in 1983.

8.    **Goel,** age 51, resides in Los Altos, California. Goel is a managing director within Intel's treasury group. He serves as a managing director at Intel Capital, an Intel subsidiary that makes proprietary equity investments in technology companies. Goel is a friend of Rajaratnam's. Goel received an MBA in Finance from the Wharton School of the University of Pennsylvania in or around 1983.

9.    **Kumar,** age 51, resides in Saratoga, California. Kumar is a director at global consulting firm McKinsey. Kumar is also on the Executive Board of the Indian School of Business. Kumar is a friend of Rajaratnam's, and a direct or indirect investor in certain Galleon funds.

10.    **Chiesi,** age 43, resides in New York, New York. Chiesi is a portfolio manager at New Castle, a registered hedge fund investment adviser. Chiesi holds Series 7 and 63 securities licenses.

11.    **Kurland,** age 60, resides in Mount Kisco, New York. Kurland is a Senior Managing Director and General Partner at New Castle.

12.    **Moffat,** age 53, resides in Ridgefield, Connecticut. Moffat is Senior Vice President and Group Executive, Systems and Technology Group at IBM.

13.    **New Castle,** a Delaware limited liability company, is a registered investment adviser based in White Plains, New York, that was formerly part of Bear Stearns Asset Management. New Castle serves as the investment adviser to several hedge funds and, as of April 17, 2009, had assets under management of over $971 million.

## RELEVANT ENTITIES

14.    **Akamai** is a Delaware corporation headquartered in Cambridge, Massachusetts. Akamai provides services for facilitating the delivery of content and applications over the internet. Akamai's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock trades on the Nasdaq under the symbol "AKAM."

15.    **AMD** is a Delaware corporation headquartered in Sunnyvale, California. AMD is a global semiconductor company offering microprocessor, embedded processor, chipset and graphics products. AMD's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock trades on the New York Stock Exchange ("NYSE") under the symbol "AMD."

16.    **Clearwire** is a Delaware corporation headquartered in Kirkland, Washington. Clearwire builds and operates wireless broadband networks in the United States and abroad. Clearwire's securities are registered with the Commission pursuant to

Section 12(b) of the Exchange Act and its stock trades on the Nasdaq under the symbol "CLWR." Intel Capital provided financing for Clearwire's joint venture with Sprint, which was publicly announced on May 7, 2008.

17.    **Google** is a Delaware corporation headquartered in Mountain View, California. Google hosts one of the leading internet search engines. Google's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock trades on the Nasdaq under the symbol "GOOG."

18.    **Hilton** is a Delaware corporation that is headquartered in Beverly Hills, California. Hilton is a leading international hotel chain. Hilton's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and, prior to October 24, 2007, its stock traded on the New York Stock Exchange ("NYSE") under the symbol "HLT." On October 24, 2007, Hilton was taken private by The Blackstone Group and its stock ceased trading on the NYSE pursuant to a merger agreement that was announced after the close of the market on July 3, 2007.

19.    **IBM** is a New York Corporation headquartered in Armonk, New York. IBM is a computer technology and IT consulting corporation. IBM's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock trades on the NYSE under the symbol "IBM."

20.    **Intel** is a Delaware corporation that is headquartered in Santa Clara, California. Intel is one of the leading manufacturers of microprocessors. Intel's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and trade on the Nasdaq under the symbol "INTC." Intel, through its investment arm subsidiary, Intel Capital, invested $1 billion in a joint venture, announced publicly on

8

May 7, 2008, in which Clearwire and Sprint agreed to combine their wireless broadband, or WiMax, businesses.

21.     **McKinsey** is a global management consulting firm that advises businesses, governments and other institutions on issues of strategy, organization, technology and operations.

22.     **PeopleSupport,** is a Delaware corporation headquartered in Los Angeles, California.  On October 30, 2008, it merged with Aegis BPO Services Ltd., and became Aegis PeopleSupport.  PeopleSupport was a business process outsourcing provider offering customer management, transcription, captioning and other services. PeopleSupport's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock traded on the Nasdaq under the symbol "PSPT."

23.     **Polycom** is a Delaware corporation headquartered in Pleasanton, California.  Polycom produces applications for voice, video, data and networking. Polycom's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and trade on the Nasdaq under the symbol "PLCM."

24.     **SUN** is a Delaware corporation headquartered in Santa Clara, California. It provides network computing infrastructure.  SUN's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and trade on the Nasdaq under the symbol "JAVA."  On April 20, 2009, Oracle Corporation announced that it had entered into a definitive merger agreement pursuant to which it would acquire SUN.

## FACTS

**A.    Insider Trading in Polycom**

25.    Tipper A first met Rajaratnam in or around 1996, when Rajaratnam worked at a broker-dealer, and Tipper A was employed at a publicly traded company. In the late 1990s, after Rajaratnam had founded Galleon, Tipper A worked for a time at Galleon. In late 2005, faced with financial difficulties, Tipper A approached Rajaratnam to inquire about again working at Galleon. In response, Rajaratnam asked whether Tipper A had inside information about any public companies. Tipper A told Rajaratnam that Tipper A had, or could obtain, information regarding Polycom. Tipper A agreed to provide Rajaratnam inside information regarding Polycom in the hopes of securing a position with Galleon, and in anticipation of receiving future inside tips from Rajaratnam in exchange.

26.    Tipper A's source was a Polycom executive with access to information regarding Polycom's earnings (the "Polycom Source"). Beginning in or around 2005 the Polycom Source provided Tipper A with material nonpublic information regarding Polycom, with the knowledge that Tipper A intended to use that information in order to profit, and with the expectation that Tipper A would share a portion of Tipper A's illicit profits with the Polycom Source.

**I.    Polycom's Q4 2005 Earnings Release – January 25, 2006**

27.    In late December 2005, the Polycom Source obtained material nonpublic information concerning Polycom's unit sales and revenues for Polycom's fourth quarter 2005 ("Q4 2005"). On or before January 10, 2006, the Polycom Source provided Tipper

10

A with explicit nonpublic Q4 2005 earnings information, including that Polycom's Q4 was strong, that revenues were up and that the order backlog had increased.

28.    Following the close of the markets on January 25, 2006, Polycom released its Q4 2005 earnings, which included higher-than-expected revenues. The following day, Polycom's stock price opened at $18.30 per share, up about 8% compared to the previous day's closing price of $16.98 per share.

29.    Tipper A traded on the information provided by the Polycom Source by purchasing Polycom securities for Tipper A's personal account. On January 10, 2006, Tipper A purchased 3,000 February $17.50 Polycom call option contracts at $0.67 per contract. On January 20, 2006, Tipper A purchased an additional 500 February $17.50 Polycom call option contracts at $0.65 per contract. Tipper A sold the Polycom call option contracts following Polycom's Q4 2005 earnings announcement, at varying prices, reaping profits of approximately $330,000. The Polycom Source knew that Tipper A's trades in Polycom based on The Polycom Source's tips had been profitable, and Tipper A sought to be compensated for them.

30.    On January 10th, 2006, Tipper A told Rajaratnam that Polycom's revenues for Q4 2005 would beat street estimates. Tipper A made it clear to Rajaratnam that Tipper A's information regarding Polycom was from an insider and was reliable. Following these conversations, Rajaratnam and Galleon began purchasing Polycom securities for the accounts of certain of the Galleon Tech funds. The Polycom Source and Tipper A communicated again on January 11th. Tipper A and Rajaratnam communicated again the following day and, within approximately three minutes of the communication,

Rajaratnam sent an IM to his trader instructing him to "buy 60 [thousand shares] PLCM" for certain Galleon Tech funds.

31.     All told, from January 10 through January 25, 2006, the date of the Polycom earnings release, Rajaratnam and Galleon purchased 245,000 shares of Polycom and 500 Polycom call option contracts.

32.     Following the earnings announcement, the Galleon Tech funds sold their Polycom holdings on different dates and at varying prices. Collectively, the Galleon Tech funds made over $570,000 in connection with their Polycom trades based on Tipper A's tip. On January 26th, the day after the earnings release, Rajaratnam thanked Tipper A for the Polycom information.

**II.    Polycom's Q1 2006 Earnings Release – April 19, 2006**

33.     On or before April 10, 2006, the Polycom Source learned that Polycom's revenues for first quarter 2006 ("Q1 2006") would beat market expectations.

34.     On or about April 10, 2006, the Polycom Source communicated the inside information about Polycom's Q1 2006 revenues to Tipper A. On or about April 13, 2006, Tipper A passed this information on to Rajaratnam, making it clear that the information was from the same source who had provided the inside information on Polycom's Q4 2005 earnings in January 2006.

35.     On April 17, 2006, Tipper A purchased 200 April $20 Polycom calls at $1.35 per contract and between April 13 and 18, 2006, Rajaratnam purchased 250,000 Polycom shares on behalf of the Galleon Tech funds.

36.     On April 19, 2006, Polycom's stock opened at $21.85 per share and began to climb in advance of the after-hours earnings release, closing at $22.52 per share.

Following the market close on April 19, Polycom released its Q1 2006 earnings, which included higher-than-expected revenues. Later that day, Rajaratnam congratulated Tipper A for the Polycom tip. On April 20, 2006, Polycom opened at $22.72 per share. The Galleon Tech funds sold some of their Polycom shares in the run-up before the announcement on April 19 and then sold the rest following the announcement for a profit of over $165,000. Tipper A sold Tipper A's options on April 19 during the run-up before the announcement, making a profit of $22,000.

**B.    Insider Trading in Hilton**

37.    Tipper A obtained confidential nonpublic information in advance of a July 3, 2007 takeover announcement that a private equity group would be buying Hilton for $47.50 per share, a premium of $11.45 over the July 3 closing price (the "Hilton Transaction"). Tipper A obtained the information from an analyst (the "Hilton Source") who, at the time, was working at Moody's, a rating agency that was evaluating Hilton's debt in connection with the Hilton Transaction.

38.    On or about July 2, 2007, the Hilton Source provided Tipper A with specific information concerning the upcoming Hilton Transaction. The Hilton Source told Tipper A that Hilton was going to be taken private in a deal to be announced the following day, at a price around the mid-$40s per share. The Hilton Source indicated that the Hilton Source had learned this information through a meeting that representatives of Moody's had with Hilton management. Immediately after receiving this information, Tipper A purchased 550 August $35 Hilton call options contracts at $1.07 per contract. The following morning, Tipper A purchased 100 July $35 Hilton call option contracts at $0.90 per contract.

39.     Also on or about July 2, 2007, Tipper A told Rajaratnam that Hilton was going to be taken private at a price somewhere in the mid-$40s per share in a deal to be announced the following day. Tipper A described the Hilton Transaction to Rajaratnam as a sure thing.

40.     After receiving the tip from Tipper A, on July 3, 2007, Rajaratnam and Galleon purchased 400,000 shares of Hilton in the Galleon Tech funds, whose stated purpose is to make investments in the technology sector.

41.     On the evening of July 3, the Hilton Transaction was announced at an $11.45 per share premium over that day's closing price of $36.05. On July 5, the first trading day after the holiday, Hilton shot up to $45.39 per share.

42.     On July 5, Tipper A sold all of the Hilton call option contracts that Tipper A had purchased on July 2 and 3 for a profit of over $630,000.

43.     To compensate the Hilton Source for the Hilton tip, Tipper A paid the Hilton Source $10,000.

44.     The Galleon Tech funds sold their Hilton shares after the July 3 announcement for a profit of over $4 million.

45.     In addition, on July 3, 2007, Rajaratnam, or someone acting on his behalf, purchased 7,500 Hilton shares on behalf of defendant Goel, using Goel's brokerage account held at Charles Schwab & Co., Inc. (the "Schwab Account"). The shares were sold on July 6, 2007 for a profit of over $78,000.

## C.    **Insider Trading in Google**

46.     Within a week of the Hilton tip, Tipper A obtained material nonpublic information from another source (the "Google Source") concerning Google's second quarter, 2007 ("Q2 2007"), results, which were scheduled to be announced after the close of the markets

14

on July 19, 2007. The Google Source worked at Market Street, a consulting firm that did public relations work on behalf of various companies, including Google. As a result, the Google Source had access to material nonpublic information concerning Google's earnings announcements.

47.    On or about July 10, 2007, the Google Source told Tipper A, that Google's earnings per share ("EPS") would be down about 25 cents, which was in sharp contrast to the market's expectation that Google's EPS would be strong. After receiving the Google tip from the Google source, beginning on July 12, 2007, and up until the day of the announcement, Tipper A purchased a total of 566 August 2007 $530 put options in Google. Tipper A sold all of the put options the day after the announcement for a profit of over $500,000.

48.    Shortly after receiving the Google tip from the Google Source, Tipper A passed the Google tip to Rajaratnam, telling him to short Google because earnings would be below the street's expectations. On or before July 17, 2007, Tipper A told Rajaratnam that Tipper A's source for the tip was a consultant for Google who had access to earnings information pre-announcement.

49.    After receiving the tip from Tipper A, Rajaratnam and Galleon began buying Google put options for the Galleon Tech funds and continued buying them through July 19. In addition, the Galleon Captains funds purchased Google put options, sold Google call options and sold short Google stock beginning July 17, 2007 and through the day preceding Google's Q2 2007 earnings announcement.

50.    After the markets closed on July 19, 2007, Google announced its Q2 2007 earnings results, disclosing, among other things, that its EPS was 25 cents lower than for Q1 2007. Google's share price fell from over $548 per share to almost $520 per share.

51.     Tipper A sold Tipper A's put options after the July 19, 2007 Google announcement for a profit of over $500,000.

52.     The Galleon Tech funds' profits from the Google tip were nearly $8 million, and the Galleon Captains funds made over $1.3 million. Thus, the combined profits generated by Rajaratnam and Galleon on behalf of the various Galleon funds from insider trading in Google on the basis of Tipper A's tip concerning Google's July 19, 2007 announcement exceed $9 million.

53.     After the Google Source provided Tipper A with the above information, the Google Source told Tipper A that unless Tipper A paid the Google Source a fee of $100,000-$150,000 per quarter the Google Source would cease providing Tipper A with inside information. Tipper A demurred and the Google Source stopped providing tips.

**D.    Insider Trading in Intel**

54.     On several occasions, Rajaratnam obtained inside information concerning Intel from defendant Goel, a managing director in Intel's treasury group and at Intel Capital. The treasury group is part of Intel's finance department and Intel Capital reports directly to Intel's President & Chief Executive Officer.

**(a)    Intel's Q4 2006 Earnings Release – January 16, 2007**

55.     Beginning on or about January 8, and through January 16, 2007, Goel communicated to Rajaratnam material nonpublic information about Intel's fourth quarter, 2006 ("Q4 2006"), financial results and Intel's outlook going forward.

56.     On January 8, 2007, approximately one week before Intel's scheduled Q4 2006 earnings announcement, Rajaratnam contacted Goel. The next day, on January 9,

2007, Rajaratnam and Galleon purchased 1,000,000 shares of Intel at $21.08 per share, and, on January 11, 2007, purchased an additional 500,000 shares, at $21.65 per share.

57.    Goel and Rajaratnam communicated again multiple times over the Martin Luther King Day weekend that followed. On Tuesday, January 16, 2007, the day the markets reopened after the long weekend, Rajaratnam and Galleon abruptly shifted course with respect to Intel, selling the Galleon Tech funds' entire 1,500,000-share long position in Intel at $22.03 per share, and making a profit of a little over $1 million. Goel again contacted Rajaratnam that afternoon.

58.    Later that day, after the markets closed, Intel released its Q4 2006 earnings. Although the company's earnings were slightly higher than analysts' projections, its guidance was below expectations.

59.    As a result, Intel's stock price, which had closed at $22.30 per share, opened at $21.25 on January 17, 2007, down $1.05 per share, or nearly 5%. Goel contacted Rajaratnam three times that day. The Galleon Tech funds' combined loss avoidance as a result of the January 16th sell-off was approximately $1.4 million.

## II.    Intel's Q1 2007 Earnings Release – April 17, 2007

60.    The following quarter, Goel again provided Rajaratnam material nonpublic information concerning Intel's earnings and financial guidance. On April 9, 2007, approximately one week before Intel's scheduled Q1 2007 earnings announcement, Rajaratnam and Galleon began selling short Intel's stock. The funds sold short 1,000,000 shares at $20.14 per share. Goel and Rajaratnam spoke with each other multiple times in the days leading up to the trades, including on April 9, 2007. Later that day, after Rajaratnam's communication with Goel, Tipper A communicated with Rajaratnam. That

night, Tipper A emailed the principal of another hedge fund, "Also spoke to Raj[aratnam] . . This is what I got . . . [Intel] dn 10% . . .

61.     The next day, April 10, 2007, Rajaratnam and Galleon sold short a combined 150,000 Intel shares at $20.68 per share. On that day, Goel communicated with a member of Intel's IR department, who, at the time of the calls, was aware of Intel's quarterly earnings numbers. Goel and Rajaratnam communicated again on April 11 and 13, 2007. After the April 13 contact, Rajaratnam and Galleon reversed course and began covering the Galleon Tech funds' short positions in Intel, and purchased 500,000 Intel shares at $20.45 per share. Goel and Rajaratnam communicated again on the telephone later that afternoon.

62.     On Saturday, April 14, 2007, Goel reached out again to his contact in Intel's IR department and then communicated with Rajaratnam. Then, on Monday, April 16, 2007, Goel repeatedly tried to contact Rajaratnam who was traveling in the Caribbean at the time. Shortly after Rajaratnam and Goel spoke, Rajaratnam contacted another portfolio manager who manages some Galleon hedge funds, including the Captain's Fund. Beginning immediately after that communication, the Galleon Tech funds purchased 500,000 Intel shares at $20.63 per share and covered their existing short position – 650,000 shares – at $20.61 per share. Also immediately after the communication, other Galleon funds, including the Galleon Captains Fund and Galleon Communications Fund, started covering their existing short positions in Intel, purchasing Intel shares, and selling Intel put options.

63.     On April 17, 2007, Rajaratnam and Galleon purchased 1,479,044 shares of Intel at prices ranging from $20.81 to $21.42 per share. Later that day, after the markets

closed, Intel released its Q1 2007 earnings, raising its profitability target for the rest of the year. Intel's share price, which had been $20.77 at the close, rose following the announcement, primarily due to Intel's improved outlook on profitability, which was based mainly on cost reductions rather than any increases in revenues or sales. In fact, Intel's revenues were down 9% compared with Q4 2006, which ties closely with what Rajaratnam had told Tipper A, as reflected in Tipper A's April 9, 2007 communication.

64.     In sum, Rajaratnam and Galleon established a sizable short position in Intel after Rajaratnam learned of Intel's lower revenue numbers from Goel on or around April 9, but then changed course and took a long position after Goel told Rajaratnam, on or around April 13, that Intel would be raising its profitability target for the rest of the year. The funds' profit on the above trades was approximately $1.3 million, and its loss avoidance was approximately $917,000.

### III.     Intel's Q3 2007 Earnings Release – October 16, 2007

65.     A couple of quarters later, Goel once again gave Rajaratnam material nonpublic information concerning Intel's earnings and financial guidance and Rajaratnam and Galleon traded on the information. On October 8, 2007, a week or so ahead of Intel's scheduled Q3 2007 earnings announcement, Goel contacted Rajaratnam. Two days later, on October 10, 2007, Rajaratnam and Galleon purchased 500,000 Intel shares at an average price of $25.82 per share.

66.     On October 15, 2007, the day before Intel's earnings announcement, Goel and Rajaratnam communicated again. The following day, Rajaratnam and Galleon purchased an additional 450,000 Intel shares at $25.74 per share. After the markets closed that day, Intel released its Q3 2007 earnings, raising guidance and reporting

revenues and earnings that beat expectations. Following the announcement, Intel's share price, which had closed at $25.48 on October 16th, opened on October 17th at $26.79 per share, up more than 5%. On October 17th, Goel communicated with Rajaratnam, and Rajaratnam and Galleon sold the 950,000 Intel shares that they had acquired, at a price of approximately $26.73 per share, for a realized profit of over $690,000.

**E.    Insider Trading in Clearwire**

67.    Goel, who is a managing director at Intel Capital, an Intel subsidiary that invests in technology companies, also tipped Rajaratnam about a joint venture between Clearwire and Sprint through which the two companies combined their wireless broadband, or WiMAX, businesses to form a new wireless communications company (the "Clearwire Transaction").

68.    The Clearwire Transaction was publicly announced on May 7, 2008. Intel Capital, which was Clearwire's largest shareholder, owning about a 20% stake and having representation on Clearwire's Board at the time of the deal, invested $1 billion in the Clearwire-Sprint joint venture. According to press reports, the investment was Intel Capital's largest ever.

69.    Between early February 2008 and May 2008, the Galleon Tech funds engaged in three rounds of Clearwire trading, all in close proximity to communications between Goel and Rajaratnam. In all three rounds, the Galleon Tech funds traded in advance of news reports relating to the deal between Clearwire and Sprint.

70.    First, the Galleon Tech funds began building a long position in Clearwire on February 8, 2008 (continuing through February 14) of 375,350 shares following several timely contacts between Goel and Rajaratnam, including on the morning of

February 8. On February 15, after multiple media outlets reported rumors that Clearwire

and Sprint might revive a previously announced and abandoned plan to combine their

wireless broadband businesses and announce a deal in the next few days (sending

Clearwire's stock price up over 5%), the Galleon Tech funds began to liquidate their

position.

71.    Then, on March 19 and 20, 2008, Goel and Rajaratnam communicated

repeatedly. On the next trading day, Monday, March 24, the Galleon Tech funds again

began to build a long position in Clearwire, purchasing 125,800 shares. The funds

bought another 136,000 Clearwire shares on March 25. After market-close that day, the

media reported that Clearwire had created a severance plan for its employees in the event

of a takeover, again fueling speculation that Clearwire was close to striking a deal with

Sprint.

72.    On March 26, multiple media outlets reported that Clearwire and Sprint

might get funding for the rumored joint venture from two major cable companies,

sending Clearwire's share price up almost 6% by the end of the trading day. That same

day, the Galleon Tech funds began to sell the Clearwire shares they had accumulated,

eventually liquidating their position by April 18.

73.    The Galleon Tech funds again established a long position in Clearwire on

May 6, 2008, the day before the Clearwire Transaction was announced, purchasing

290,750 shares. The trades were once again preceded by contact between Goel and

Rajaratnam (on April 20, 23, and 30). Clearwire's stock price jumped almost 9% on May

7 in the wake of the announcement, before declining over the course of the day to close

down 1.46%. The Galleon Tech funds, however, sold roughly half their Clearwire

position for a sizeable profit on May 7, liquidating the rest by May 27.

74.    Overall, the Galleon Tech funds realized illicit gains of about $780,000 on

their Clearwire trading between February and May 2008.

## F.    Insider Trading in PeopleSupport

75.    Rajaratnam traded on the basis of material nonpublic information

concerning PeopleSupport on behalf of Goel.

76.    During 2008, Galleon had regular access to inside information about

PeopleSupport, a back office outsourcing company, because Galleon was a 25% owner of

the company, and because a managing director at Galleon served on PeopleSupport's

Board of Directors.

77.    On two separate occasions during 2008, Rajaratnam purchased securities

of PeopleSupport through Goel's personal Schwab Account. First, Rajaratnam purchased

30,000 shares in advance of PeopleSupport's August 4, 2008 announcement that

PeopleSupport would be acquired by Aegis BPO Services Ltd. ("Aegis"). These shares

were sold for a profit of about $102,000 after PeopleSupport's share price spiked 25% in

response to the merger announcement.

78.    Second, in advance of PeopleSupport's October 8, 2008 announcement

that the merger with Aegis was confirmed (there had been a request to delay the merger

the previous day), Rajaratnam purchased 29,000 PeopleSupport shares for Goel's Schwab

Account. The shares were sold after the October 8 announcement for a profit of about

$48,000.

G.    **Insider Trading in Akamai**

79.    An executive at the internet services company Akamai and a family friend of Chiesi's (the "Akamai Source"), provided material nonpublic information about Akamai's disappointing Q2 2008 earnings results to Chiesi in advance of Akamai's July 30, 2008 earnings announcement (the "Q2 2008 Earnings Announcement"). Specifically, the Akamai Source told Chiesi that Akamai would guide lower and that the consensus among Akamai's management was that Akamai's stock price would decline in the wake of the Q2 2008 Earnings Announcement.

80.    In its Q2 2008 Earnings Announcement on July 30, 2008 (and in the earnings conference call associated with the release), Akamai announced results that missed both the consensus sales estimate and the consensus revenues forecast. Akamai also announced earnings and revenues forecasts that were below consensus estimates. Following the announcement, Akamai's stock declined nearly 20%, from $31.25 per share on July 30 to $25.06 per share on the day after the announcement.

81.    Chiesi communicated with the Akamai Source numerous times, and also traded in Akamai profitably on behalf of the New Castle funds, ahead of the Q2 2008 Earnings Announcement. Specifically, Chiesi and the Akamai Source spoke multiple times between July 2 and July 24, 2008, and had two lengthy discussions on July 24, 2008. Immediately following the second of these discussions, Chiesi communicated material nonpublic information she had learned from the Akamai source to Kurland. On the following day, July 25, several New Castle funds initiated short positions in Akamai shares, adding to the short positions through July 30, 2008, and purchasing 1,466 Aug 2008 $30 Akamai put options on July 30. In the day or so before Akamai's Q2 2008

Earnings Announcement, Chiesi had two additional calls with the Akamai Source. Following the Q2 2008 Earnings Announcement, the New Castle funds covered their combined Akamai short position, which had grown to almost 290,000 shares, and sold their Akamai puts, generating profits of approximately $2.4 million.

82.    In addition to trading Akamai shares for the New Castle funds based on the tip from the Akamai Source, Chiesi also passed the Akamai Source's tip to Rajaratnam and Galleon.

83.    On July 2, 2008, Chiesi contacted Rajaratnam before the market opened and conveyed to him material nonpublic information about Akamai's Q2 2008 Earnings Announcement. Within minutes of the open, certain of the Galleon Tech funds started to build a short position in Akamai, selling short a combined 69,350 Akamai shares. The Galleon Tech funds steadily increased the short position until July 18, 2008, selling short an additional 138,600 Akamai shares and adding 3,000 put options. Chiesi and Rajaratnam communicated repeatedly on July 23 and 24, 2008, oftentimes immediately before or after Chiesi spoke with the Akamai Source. On the day following this spate of communications, July 25, 2008, the Galleon Tech funds dramatically augmented their short position in Akamai, selling short another 138,550 Akamai shares. On July 29, the Galleon Tech funds sold short another 173,300 Akamai shares. Then, on the morning of July 30, 2008, the day of the Q2 2008 Earnings Announcement, Rajaratnam contacted Chiesi repeatedly, shortly after she communicated with the Akamai Source, and the Galleon Tech funds increased their short position yet again, selling short another 211,650 Akamai shares. The Galleon Tech funds closed their half-million-share short position

and put options in the days following the announcement for a combined profit of over $3.2 million.

**H.     Insider Trading in SUN**

84.     Moffat, IBM's Senior Vice President and Group Executive, Systems and Technology Group, conveyed to Chiesi material nonpublic information about SUN's Q2 2009 results in advance of SUN's January 27, 2009 earnings release.

85.     In January 2009, IBM was conducting due diligence on SUN in contemplation of a possible acquisition by IBM of SUN. Pursuant to a confidentiality agreement between IBM and SUN entered into as part of that process, SUN provided IBM with its Q2 2009 earnings results in advance of the January 27, 2009 announcement. Moffat was involved in IBM's due diligence of SUN, and as a result had access to SUN's earnings results.

86.     Chiesi and Moffat, who are friends, contacted each other repeatedly during January 2009, with the frequency of contact between the two increasing significantly just prior to the SUN earnings release.

87.     Moffat was one of a group of IBM executives on the preliminary due diligence team arriving at a designated location to conduct due diligence on SUN on January 19, 2009. Moffat contacted Chiesi at home that evening, and had several conversations with her over the next several days. In the course of one or more of these conversations, Moffat provided Chiesi with material nonpublic information concerning SUN's Q2 2009 earnings.

88.     On Monday, January 26, New Castle began acquiring a substantial long position in SUN. On January 27, 2009, after the market close, SUN reported its Q2 2009

earnings information. SUN's performance substantially exceeded consensus estimates, including higher revenue and margins, posting a $0.02 per share profit whereas consensus estimates called for a loss of $0.09/0.10 per share. SUN's shares rallied on the news, rising 21%, from a January 27 close of $3.99 per share to a January 28 close of $4.86 per share, generating profits of nearly $1 million for New Castle.

89.    On January 28, 2009, Moffat transmitted to SUN, on behalf of IBM, a preliminary proposal to acquire SUN.

90.    Moffat also tipped Chiesi to material nonpublic information about IBM's quarters ending December 2008 and March 2009 that he obtained by virtue of his position at IBM, and Chiesi traded on the information she received from Moffat on behalf of New Castle. Finally, Moffat tipped Chiesi to material nonpublic information about the AMD Transactions described immediately below that Moffat obtained by virtue of IBM's participation in the deal, and Chiesi traded on the information she received from Moffat on behalf of New Castle.

**I.    Insider Trading in AMD**

91.    Kumar, a director at McKinsey and a friend of Rajaratnam's, provided material nonpublic information to Rajaratnam about AMD's transactions with two Abu Dhabi sovereign entities prior to the October 7, 2008 public announcement concerning those transactions.

92.    On October 7, 2008, AMD announced a spin off of its semiconductor manufacturing operations into a joint venture with Advanced Technology Investment Company, an investment company formed by the government of Abu Dhabi. AMD also announced that an Abu Dhabi sovereign wealth fund, Mubadala Investment Co., would

be investing $314 million in AMD. Both deals were publicly announced prior to the market open on October 7, 2008 (collectively, the "AMD Transactions").

93.    Beginning on June 1, 2008, McKinsey began advising AMD in connection with AMD's negotiations with the two Abu Dhabi sovereign entities. Kumar was one of the individuals at McKinsey knowledgeable about the negotiations, having first been contacted about the matter on June 1, 2008.

94.    Kumar and Rajaratnam communicated numerous times concerning the contemplated transactions with the Abu Dhabi entities. On August 14, Kumar learned that the parties to the AMD Transactions had decided to proceed with the deal, and on August 15th Kumar conveyed this information to Rajaratnam. That day, Rajaratnam and Galleon dramatically increased their long position in AMD by purchasing over 2.5 million shares in various Galleon funds and continued to build their long position up until just days before the announcement of the AMD Transactions: Rajaratnam and Galleon purchased 4,000,000 AMD shares on September 25 and 26, and an additional 1,654,550 AMD shares on October 3rd.

95.    AMD's stock price increased by about 24.6% in the aftermath of the announcement of the AMD Transactions, opening at $5.27 per share on October 7 after closing the day before at $4.23 per share. The aggregate value of Galleon's position in AMD increased approximately $9.5 million from October 6 to October 7, 2008. However, because the Galleon Tech funds had accumulated much of their AMD position beginning in August, before the worldwide economic crisis sent stock prices, including AMD's, tumbling in September and October 2008, the funds lost money on the overall trade. Nevertheless, the funds' investment increased significantly on the news.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against all Defendants)

96.   The Commission realleges and incorporates by reference paragraphs 1 through 95, as though fully set forth herein.

97.   The information concerning (i) the Polycom January 25 and April 19, 2006, earnings announcements, (ii) the Hilton Transaction, (iii) the Google July 19, 2007 earnings announcement, (iv) the Intel January 16, April 17 and October 16, 2007 earnings announcements, (v) the Clearwire Transaction, (vi) the PeopleSupport Merger Announcements, (vii) the Akamai July 30, 2008 earnings announcement, (viii) the SUN January 27, 2009 earnings announcement and (ix) the AMD Transactions, respectively, were, in each case, material and nonpublic.

98.   The Polycom Source, Goel and the Akamai Source each obtained material nonpublic information as a result of being insiders at their respective companies. The Hilton Source, the Google Source, Moffat and Kumar each obtained material nonpublic information from their respective employers and/or as a result of a confidential or other relationship of trust and confidence with the public company issuers whose securities were traded based on their tips.

99.   The Polycom Source, Goel, the Akamai Source, the Hilton Source, the Google Source, Moffat and Kumar respectively, each breached a fiduciary duty, or other relationship of trust and confidence, by providing material nonpublic information to their respective tippee or tippees, and each knew, or was reckless in not knowing, that the information they conveyed was material and nonpublic.

28

100.    Each of the Polycom Source, the Hilton Source, the Google Source, Goel, the Akamai Source, Moffat and Kumar, tipped their respective tippee or tippees with the expectation of receiving a benefit.

101.    Tipper A knew, or was reckless in not knowing, that the information Tipper A obtained from the Polycom Source, the Hilton Source and the Google Source, concerning, (i) the January 25, 2006 and April 19, 2006 Polycom earnings announcements, (ii) the Hilton Transaction, and (iii) the Google July 19, 2007 earnings announcement, was material and nonpublic, and Tipper A knew, or was reckless in not knowing that the information was conveyed in breach of a fiduciary duty or similar relationship of trust and confidence.

102.    Rajaratnam and Galleon knew, or were reckless in not knowing, that the information Rajaratnam and Galleon: (i) obtained from Goel concerning the (a) January 16, April 17 and October 16, 2007, Intel earnings announcements, and (b) the Clearwire Transaction, (ii) obtained concerning the PeopleSupport Merger Announcements, and traded on for the benefit of Goel and (iii) obtained from Kumar concerning the AMD Transactions, was material and nonpublic, and Rajaratnam and Galleon knew, or were reckless in not knowing that such information was conveyed in breach, in each case, of a fiduciary duty or similar relationship of trust and confidence.

103.    Chiesi knew, or was reckless in not knowing, that the information Chiesi obtained from the Akamai Source and Moffat concerning (i) the Akamai July 30, 2008 earnings announcement, and, (ii) the January 27, 2009 SUN earnings announcement, was material and nonpublic, and Chiesi knew, or was reckless in not knowing that the

information was conveyed in breach, in each case, of a fiduciary duty or similar relationship of trust and confidence.

104.    Each of the defendants who traded and also tipped, namely Tipper A and Chiesi, passed the material, nonpublic information each received along to their respective downstream tippees with the expectation of a benefit therefrom.

105.    Tipper A knew, or was reckless in not knowing, that the information Tipper A provided to Rajaratnam and Galleon concerning: (i) the Polycom January 25 and April 19, 2006 earnings announcements; (ii) the Google July 19, 2007 earnings announcement; and (iii) the Hilton Transaction, was material and nonpublic, and was conveyed in breach, in each case, of a fiduciary duty or similar relationship of trust and confidence.

106.    Chiesi knew, or was reckless in not knowing, that the information that Chiesi provided to Rajaratnam and Galleon concerning the July 30, 2008 Akamai earnings announcement, was material and nonpublic, and was conveyed in breach of a fiduciary duty or similar relationship of trust and confidence.

107.    Rajaratnam and Galleon knew, or were reckless in not knowing, that the information Rajaratnam and Galleon obtained from: (i) Tipper A concerning the January 25, 2006, and April 19, 2006, Polycom earnings announcements, the Hilton Transaction and the Google July 19, 2007, earnings announcement, and (ii) Chiesi concerning the July 30, 2008, Akamai earnings announcement, was material and nonpublic, and Rajaratnam and Galleon knew, or were reckless in not knowing that such information was conveyed, in each case, in breach of a fiduciary duty or similar relationship of trust and confidence.

108.   Rajaratnam and Galleon are liable for the trading occurring in the funds advised by Galleon because they effectuated the trades in those funds, controlled those funds, and unlawfully passed on material nonpublic information to those funds.

109.   Kurland and New Castle knew, or were reckless in not knowing, that the information Kurland and New Castle obtained from Chiesi concerning Akamai's Q2 2008 Earnings Announcement was material and nonpublic, and Kurland and New Castle knew, or were reckless in not knowing that such information was conveyed in breach of a fiduciary duty or similar relationship of trust and confidence.

110.   Kurland and New Castle are liable for the trading occurring in the funds advised by New Castle because they effectuated the trades in those funds, controlled those funds, and unlawfully passed on material nonpublic information to those funds.

111.   By virtue of the foregoing, the Defendants, in connection with the purchase or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which would operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

112.   By virtue of the foregoing, the Defendants directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II
### Violations of Section 17(a) of the Securities Act
### (Against All Defendants Except Kumar and Moffat)

113.    The Commission realleges and incorporates by reference paragraphs 1 through 112, as though fully set forth herein.

114.    By virtue of the foregoing, Galleon, Rajaratnam, Goel and Chiesi, in the offer or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which would operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

115.    By the conduct described above, the Defendants (except Kumar and Moffat) directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## RELIEF SOUGHT

**WHEREFORE,** the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining each of the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Permanently restraining and enjoining each of the Defendants (except Kumar and Moffat), their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)];

**III.**

Ordering the Defendants to disgorge, with prejudgment interest, all illicit trading profits, other ill-gotten gains received, and/or losses avoided as a result of the conduct alleged in this Complaint, including, as to each of the Defendants, their own illicit trading profits, other ill-gotten gains, and/or losses avoided, and the illicit trading profits, other ill-gotten gains, and/or losses avoided of their direct and downstream tippees.

**IV.**

Ordering the Defendants to pay civil monetary penalties pursuant to Section 21(d)(3) and/or Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1], and Section 20(d) of the Securities Act [5 U.S.C. § 77t(d)];

**V.**

Barring defendants Goel and Moffat pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], and for such other relief as the Court may deem appropriate.

## VI.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
October 16, 2009

David Rosenfeld

_____
Attorney for Plaintiff
Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153

Of Counsel:

Sanjay Wadhwa (WadhwaS@sec.gov)
Israel Friedman (FriedmanI@sec.gov)
Jason E. Friedman (FriedmanJ@sec.gov)
John Henderson* (HendersonJ@sec.gov)

* _not admitted in the S.D.N.Y._