David Rosenfeld
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

:
:
:                    09 Civ. 8811

                      Plaintiff,

:                    (JSR)
:

        -against-

:                    ECF CASE
:

GALLEON MANAGEMENT, LP,
RAJ RAJARATNAM,
RAJIV GOEL,
ANIL KUMAR,
DANIELLE CHIESI,
MARK KURLAND,
ROBERT MOFFAT,
NEW CASTLE FUNDS LLC,
ROOMY KHAN,
DEEP SHAH,
ALI T. FAR,
CHOO-BENG LEE,
FAR & LEE LLC,
SPHERIX CAPITAL LLC,
ALI HARIRI,
ZVI GOFFER,
DAVID PLATE,
GAUTHAM SHANKAR,
SCHOTTENFELD GROUP LLC,
STEVEN FORTUNA,
 and
S2 CAPITAL MANAGEMENT, LP,

:                    AMENDED
:                    COMPLAINT
:
:                    JURY TRIAL
:                    DEMANDED
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

                     Defendants.

:
:

---

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against defendants Galleon Management, LP ("Galleon"), Raj Rajaratnam ("Rajaratnam"), Rajiv Goel ("Goel"), Anil Kumar ("Kumar"), Danielle Chiesi ("Chiesi"), Mark Kurland ("Kurland"), Robert Moffat ("Moffat"), New Castle Funds LLC ("New Castle"), Roomy Khan ("Khan"), Deep Shah ("Shah"), Ali T. Far ("Far"), Choo-Beng Lee ("Lee"), Far & Lee LLC ("Far & Lee"), Spherix Capital LLC ("Spherix Capital"), Ali Hariri ("Hariri"), Zvi Goffer ("Goffer"), David Plate ("Plate"), Gautham Shankar ("Shankar"), Schottenfeld Group LLC ("Schottenfeld"), Steven Fortuna ("Fortuna"), and S2 Capital Management, LP ("S2 Capital"), alleges as follows:

## SUMMARY

1.      This case involves widespread and repeated insider trading at several hedge funds, including Galleon – a multi-billion dollar New York hedge fund complex founded and controlled by Rajaratnam – New Castle, Spherix Capital, and S2 Capital. The sources of the inside information include Goel, a managing director at Intel Corporation ("Intel"), Kumar, a director at McKinsey & Co. ("McKinsey"), Moffat, a senior executive at IBM, as well as executives and consultants at other well known companies. The inside information concerned market moving events such as quarterly earnings announcements, takeovers, and material contracts. The scheme generated over $33 million in illicit profits or losses avoided.

2.      The unlawful trading involved inside information concerning at least 12 different companies, including Google, Inc. ("Google"), Hilton Hotels Corporation ("Hilton"), and Intel. Specifically:

(i)     A Polycom, Inc. ("Polycom") senior executive tipped Khan to material nonpublic information about Polycom's Fourth Quarter ("Q4") 2005 and Q1 2006 earnings. Khan traded based on that information and, in turn, tipped Rajaratnam, who traded on behalf of Galleon based on that information.

(ii)    Shah, a Moody's rating agency analyst, tipped Khan to material nonpublic information about the impending takeover of Hilton by The Blackstone Group. Khan traded based on that information and also tipped Rajaratnam, who traded on behalf of Galleon based on that information. Khan also tipped another person ("Tipper X") who traded based on that information and tipped Shankar. Shankar traded based on the information and also tipped Goffer and others at Schottenfeld all of whom traded based on that information.

(iii)   An employee at Market Street Partners, an investor relations consulting firm that did work for Google, tipped Khan and Lee to material nonpublic information about Google's Q2 2007 earnings. Khan traded based on that information and also tipped Rajaratnam, who traded based on that information on behalf of Galleon. Khan also tipped Tipper X, who also traded based on that information. Tipper X, in turn, tipped Shankar who also traded based on that information. Lee tipped Far, his business partner, and Lee and Far traded based on the information in an account in the name of Far & Lee LLC.

(iv)    A friend of Shah (the "Kronos Source") tipped Shah to material nonpublic information about the impending acquisition of Kronos Inc. ("Kronos"). Shah then tipped Khan who traded based on that information and also tipped Tipper X. Tipper X traded based on the information and also tipped Shankar. Shankar traded based on the information and also tipped Goffer and Plate, both of whom also traded based on the information.

(v)     Goel tipped Rajaratnam to material nonpublic information about Intel's Q4 2006, Q1 2007 and Q3 2007 earnings, and Rajaratnam traded on behalf of Galleon based on that information.

(vi)    Goel also tipped Rajaratnam to material nonpublic information about a pending joint venture involving Clearwire Corporation ("Clearwire") and Sprint Nextel Corporation ("Sprint"). Rajaratnam traded on behalf of Galleon based on that information.

(vii)   As payback for Goel's Intel and Clearwire tips, Rajaratnam traded in Goel's personal account on the basis of material nonpublic information concerning PeopleSupport, Inc. ("PeopleSupport"), a company that was acquired by Aegis BPO Services Ltd. Rajaratnam also traded in Goel's personal account on the basis of material nonpublic information about the impending takeover of Hilton, as additional payback for Goel's tips.

(viii)  Kumar tipped Rajaratnam to material nonpublic information about Advanced Micro Devices Inc.'s ("AMD") pending transactions with

two Abu Dhabi sovereign entities, and Rajaratnam traded on behalf of Galleon based on that information.

(ix)    An Akamai Technologies, Inc. ("Akamai") executive tipped Chiesi to material nonpublic information about Akamai's Q2 2008 earnings. Chiesi tipped Kurland, and Chiesi and Kurland traded based on that information on behalf of New Castle. Chiesi also tipped Rajaratnam, who traded based on that information on behalf of Galleon, as well as Fortuna, who traded based on that information on behalf of S2 Capital.

(x)    Moffat tipped Chiesi to material nonpublic information about Sun Microsystems, Inc.'s ("SUN") Q2 2009 earnings. Chiesi traded on behalf of New Castle based on that information. Moffat also tipped Chiesi to material nonpublic information about IBM's fiscal quarter ending December 2008, and Chiesi traded on behalf of New Castle based on that information. In addition, Moffat and an AMD executive ("AMD Executive") each tipped Chiesi to material nonpublic information about AMD's pending transactions with two Abu Dhabi sovereign entities. Chiesi tipped Kurland, and Chiesi and Kurland traded based on that information on behalf of New Castle. Chiesi also tipped Fortuna who traded based on that information on behalf of S2 Capital.

(xi)    Hariri, an Atheros Communications, Inc. ("Atheros") executive, tipped Far to material nonpublic information about Atheros's Q4 2008

earnings. Far tipped Lee, and Far and Lee both traded based on that information on behalf of Spherix Capital.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

3.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against each of the defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all profits realized or losses avoided from the unlawful insider trading activity set forth herein, and civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. The Commission also brings this action pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] for civil penalties against the defendants under the Insider Trading and Securities Fraud Enforcement Act of 1988. In addition, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], the Commission seeks an order barring Goel, Moffat and Hariri from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], and for such other relief as the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

5.     Venue lies in this Court pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1 and 78aa]. Certain of the acts, practices, transactions and courses of business alleged herein occurred within the Southern District of New York. For example, Defendant Rajaratnam lives in New York, New York, and works at Galleon's New York, New York headquarters. Defendants Chiesi, Kurland, Goffer, and Plate all reside within the Southern District of New York, and New Castle, Schottenfeld and S2 Capital are all based within the Southern District of New York. In addition, many of the communications in furtherance of the insider trading alleged herein were made from, to, or within the Southern District of New York.

## DEFENDANTS

6.     **Galleon,** a Delaware limited partnership, is a registered investment adviser based in New York, New York, that, as of March 2009, had over $2.6 billion under management. Galleon was founded in 1997 and registered with the Commission in January 2006. Galleon serves as the investment adviser for several hedge funds, including, among others, the Technology Offshore Fund, Technology Partners Fund, Technology MAC Fund, and the Diversified Fund (collectively, the "Galleon Tech funds"), the Captains funds and the Communications funds.

7.      **Rajaratnam,** age 52, resides in New York, New York. Rajaratnam is the founder and a Managing General Partner of Galleon, and serves as the Portfolio Manager of the Galleon Tech funds. Prior to founding Galleon, Rajaratnam worked at Needham & Co., a registered broker-dealer, for 11 years, at which time he held Series 7 and Series 24 securities licenses. Rajaratnam obtained a degree from the University of Sussex, England, in 1980, and an MBA in Finance from the Wharton School of the University of Pennsylvania in 1983.

8.      **Goel,** age 51, resides in Los Altos, California. Goel is a managing director within Intel's treasury group. He is also a managing director at Intel Capital, an Intel subsidiary that makes proprietary equity investments in technology companies. Goel received an MBA in Finance from the Wharton School of the University of Pennsylvania in or around 1983, and is a friend of Rajaratnam's.

9.      **Kumar,** age 51, resides in Saratoga, California. Kumar is a director at McKinsey, a global business consulting firm. Kumar is also on the Executive Board of the Indian School of Business. Kumar is a friend of Rajaratnam's, and a direct or indirect investor in one or more funds managed by Galleon.

10.      **Chiesi,** age 43, resides in New York, New York. During the relevant time period, Chiesi was a consultant and a portfolio manager at New Castle, a registered hedge fund investment adviser. Chiesi holds Series 7 and 63 securities licenses.

11.      **Kurland,** age 60, resides in Mount Kisco, New York. Kurland is a Senior Managing Director and General Partner at New Castle.

12.     **Moffat**, age 53, resides in Ridgefield, Connecticut. During the relevant time period, Moffat was Senior Vice President and Group Executive of IBM's Systems and Technology Group.

13.     **New Castle,** a Delaware limited liability company, is a registered investment adviser based in White Plains, New York, that was formerly part of Bear Stearns Asset Management. New Castle serves as the investment adviser to several hedge funds and, as of April 17, 2009, had assets under management of over $971 million.

14.     **Khan,** age 51, resides in Ft. Lauderdale, Florida. Khan is an individual investor who was employed at Intel in the late 1990s and subsequently was employed at Galleon.

15.     **Shah,** age 27, resided in Jersey City, New Jersey during the relevant time period and, in 2007, was employed at Moody's as a lodging industry analyst. Shah left Moody's in late 2007 or early 2008, and he is believed to currently reside in India.

16.     **Far,** age 47, resides in Saratoga, California. Far is a Managing Partner, portfolio manager, and co-founder of Spherix Capital, an unregistered hedge fund investment adviser. Far is a Managing Partner of Far & Lee. Far was previously a Managing Director, portfolio manager, and analyst at Galleon. Far received a BS in Electrical Engineering and Computer Science from the University of California, Berkeley, and a JD, MBA, and Master's of Science in Electrical Engineering from Santa Clara University. Far has held Series 7 and 63 securities licenses.

17.     **Lee,** age 53, resides in San Jose, California. Lee is a Managing Partner, portfolio manager, and co-founder of Spherix Capital, an unregistered hedge fund

investment adviser. Lee is also a Managing Partner of Far & Lee. Lee received a BS in electrical engineering from Duke University in 1978 and an MBA from the University of California, Berkeley in 1987.

18. **Far & Lee,** a Delaware limited liability company, was formed in July 2007 to operate as a trading entity that was used by Lee and Far prior to their establishing Spherix Capital.

19. **Spherix Capital,** a Delaware limited liability company, is an unregistered hedge fund investment adviser based in San Jose, California. Spherix Capital was co-founded in January 2008 by Lee and Far, who are both Managing Partners and portfolio managers at Spherix Capital. Spherix Capital serves as the investment adviser to the Elliptical family of hedge funds and is in the process of winding down its operations.

20. **Hariri,** age 38, resides in San Francisco, California. Hariri has served as Vice President of Broadband Carrier Networking at Atheros since March 2008. Hariri holds a BS in Electrical and Systems Engineering and a Master's degree in Electrical Engineering from the University of Connecticut.

21. **Goffer,** age 33, resides in New York, New York. During the relevant time period, Goffer was a registered representative and proprietary trader at Schottenfeld. Currently, Goffer is employed at Echotrade LLC and is a trader at Incremental Capital, LLC. Goffer holds Series 7, 55, 63 and 65 securities licenses.

22. **Plate**, age 34, resides in New York, New York. During the relevant time period, Plate was a registered representative and proprietary trader at Schottenfeld. Currently, Plate is a registered representative at G-2 Trading, LLC. Plate holds Series 7, 55 and 63 securities licenses.

23.     **Shankar**, age 35, resides in New Canaan, Connecticut. During the relevant time period, Shankar was a registered representative and a proprietary trader at Schottenfeld. Shankar is currently unemployed. Shankar holds Series 3, 7, 55 and 63 securities licenses.

24.     **Schottenfeld,** a New York limited liability company, is a registered broker-dealer based in New York, New York.

25.     **Fortuna,** age 47, resides in Westwood, Massachusetts. Fortuna is a co-founder and principal of S2 Capital, an unregistered hedge fund investment adviser. Fortuna received a Master's degree in Engineering from Boston University in 1989 and an MBA from Columbia Business School in 1993. Fortuna has held Series 7, 63, 86 and 87 securities licenses.

26.     **S2 Capital,** a Delaware limited partnership, is an unregistered hedge fund investment adviser based in New York, New York. S2 Capital was co-founded by Fortuna. S2 Capital serves as the investment adviser to the hedge fund S2 Capital Fund, LP and is in the process of winding down its operations. During the relevant time period, S2 Capital had over $125 million under management.

## RELEVANT ENTITIES

27.     **Akamai** is a Delaware corporation headquartered in Cambridge, Massachusetts. Akamai provides services for facilitating the delivery of content and applications over the internet. Akamai's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the Nasdaq under the symbol "AKAM."

28.    **AMD** is a Delaware corporation headquartered in Sunnyvale, California. AMD is a global semiconductor company. AMD's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the New York Stock Exchange ("NYSE") under the symbol "AMD."

29.    **Atheros** is a Delaware Corporation headquartered in Santa Clara, California. Atheros is a developer of semiconductor systems for wireless and other network communication products. Atheros's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the Nasdaq under the symbol "ATHR."

30.    **Clearwire** is a Delaware corporation headquartered in Kirkland, Washington. Clearwire builds and operates wireless broadband networks in the United States and abroad. Clearwire's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the Nasdaq under the symbol "CLWR." Intel Capital provided financing for Clearwire's joint venture with Sprint, which was publicly announced on May 7, 2008.

31.    **Google** is a Delaware corporation headquartered in Mountain View, California. Google hosts one of the leading internet search engines. Google's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the Nasdaq under the symbol "GOOG."

32.    **Hilton** is a Delaware corporation that is headquartered in Beverly Hills, California. Hilton is a leading international hotel chain. Hilton's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and, prior to October 24, 2007, its stock traded on the NYSE under the symbol "HLT." On October

12

24, 2007, Hilton was taken private by The Blackstone Group and its stock ceased trading on the NYSE pursuant to a merger agreement that was announced after the close of the market on July 3, 2007.

33. **IBM** is a New York corporation headquartered in Armonk, New York. IBM is a computer technology and IT consulting firm. IBM's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the NYSE under the symbol "IBM."

34. **Intel** is a Delaware corporation that is headquartered in Santa Clara, California. Intel is one of the leading manufacturers of microprocessors. Intel's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and trade on the Nasdaq under the symbol "INTC." Intel, through its investment arm subsidiary, Intel Capital, invested $1 billion in a joint venture, announced publicly on May 7, 2008, in which Clearwire and Sprint agreed to combine their wireless broadband, or WiMax, businesses.

35. **Kronos** is a Massachusetts corporation headquartered in Chelmsford, Massachusetts. Kronos makes workforce management software for businesses. Kronos's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and, until Kronos was acquired by private equity firm Hellman & Friedman on June 11, 2007, its stock traded on the Nasdaq under the symbol "KRON."

36. **Market Street Partners** is an investor relations consulting firm in San Francisco, CA, which provided services to Google.

37. **McKinsey** is a global management consulting firm headquartered in New York, New York that advises businesses, governments and other institutions on issues of

strategy, organization, technology and operations. McKinsey provided consulting services to AMD.

38.    **Moody's** is a Delaware corporation headquartered in New York, New York. Moody's is a rating agency that performs research and analysis on borrowers' creditworthiness. Moody's is registered with the Commission as a Nationally Recognized Statistical Rating Organization. During 2007, Moody's issued ratings on Hilton's debt securities.

39.    **PeopleSupport,** is a Delaware corporation headquartered in Los Angeles, California. On October 30, 2008, PeopleSupport merged with Aegis BPO Services Ltd., and became Aegis PeopleSupport. PeopleSupport was a business process outsourcing provider offering customer management, transcription, captioning and other services. PeopleSupport's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock traded on the Nasdaq under the symbol "PSPT."

40.    **Polycom** is a Delaware corporation headquartered in Pleasanton, California. Polycom produces applications for voice, video, and data networking. Polycom's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the Nasdaq under the symbol "PLCM."

41.    **SUN** is a Delaware corporation headquartered in Santa Clara, California. It provides network computing infrastructure. SUN's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the Nasdaq under the symbol "JAVA." On April 20, 2009, Oracle Corporation announced that it had entered into a definitive merger agreement pursuant to which it would acquire SUN.

## FACTS

### A.   Insider Trading in Polycom Securities

42.    Khan first met Rajaratnam in or around 1996, when Rajaratnam worked at Needham & Co., and Khan was employed at Intel. In the late 1990s, after Rajaratnam had founded Galleon, Khan worked for a time at Galleon. In late 2005, faced with financial difficulties, Khan approached Rajaratnam to inquire about again working at Galleon. In response, Rajaratnam asked whether Khan had inside information about any public companies. Khan told Rajaratnam that she had, or could obtain, inside information regarding Polycom. Khan agreed to provide Rajaratnam inside information regarding Polycom in the hopes of securing a position with Galleon, and in anticipation of receiving future inside tips from Rajaratnam in exchange.

43.    Khan's source was a Polycom executive with access to material nonpublic information regarding Polycom's earnings (the "Polycom Source"). In or around late 2005 and early-to-mid 2006, the Polycom Source, who was a friend of Khan's, provided Khan with material nonpublic information regarding Polycom, with the knowledge that Khan intended to use that information in order to profit, and with the expectation that Khan would share a portion of Khan's illicit profits with the Polycom Source.

### a.   Polycom's Q4 2005 Earnings Release – January 25, 2006

44.    In late December 2005, the Polycom Source obtained material nonpublic information concerning Polycom's unit sales and revenues for Polycom's fourth quarter 2005 ("Q4 2005"). On or before January 10, 2006, the Polycom Source provided Khan with material nonpublic Q4 2005 earnings information, including that Polycom's Q4 was strong, its revenues were up and that its order backlog had increased.

45.    Following the close of the markets on January 25, 2006, Polycom released its Q4 2005 earnings, which included higher-than-expected revenues. The following day, Polycom's stock opened at $18.30 per share, up about 8% compared to the previous day's closing price of $16.98 per share.

46.    Khan traded on the basis of the information provided by the Polycom Source by purchasing Polycom securities for Khan's personal account. On January 10, 2006, Khan purchased 3,000 February $17.50 Polycom call option contracts at $0.67 per contract. On January 20, 2006, Khan purchased an additional 500 February $17.50 Polycom call option contracts at $0.65 per contract. Khan sold the Polycom call option contracts following Polycom's Q4 2005 earnings announcement, at varying prices, reaping profits of approximately $330,000. The Polycom Source knew that Khan's trades in Polycom based on the Polycom Source's tips had been profitable, and the Polycom Source sought to be compensated for them.

47.    On or about January 10, 2006, Khan told Rajaratnam that Polycom's revenues for Q4 2005 would beat street estimates. Khan made it clear to Rajaratnam that Khan's information regarding Polycom was from an insider and was reliable. After obtaining this information from Khan, Rajaratnam began purchasing Polycom securities for the accounts of certain of the Galleon Tech funds. The Polycom Source and Khan communicated again on January 11, 2006. Khan and Rajaratnam communicated again the following day, January 12, and within approximately three minutes of that January 12 communication, Rajaratnam sent a message to his trader instructing him to "buy 60 [thousand shares] PLCM" for certain Galleon Tech funds.

48.     All told, from January 10 through January 25, 2006, the date of the Polycom earnings release, Rajaratnam purchased 245,000 shares of Polycom and 500 Polycom call option contracts on behalf of the Galleon Tech funds.

49.     Following the earnings announcement, the Galleon Tech funds sold their Polycom holdings on different dates and at varying prices. Collectively, the Galleon Tech funds made approximately $600,000 in connection with their Polycom trades based on Khan's tip. On January 26, the day after the earnings release, Rajaratnam thanked Khan for the Polycom information.

## II.     Polycom's Q1 2006 Earnings Release – April 19, 2006

50.     On or before April 10, 2006, the Polycom Source learned, through the Polycom Source's position at Polycom, of Polycom's first quarter 2006 ("Q1 2006") financial results, including that Polycom's revenues for Q1 2006 would beat market expectations.

51.     On or about April 10, 2006, the Polycom Source communicated material nonpublic information about Polycom's Q1 2006 results to Khan. On or about April 13, 2006, Khan passed this information on to Rajaratnam, making it clear that the information was from the same source who had provided the inside information on Polycom's Q4 2005 earnings in January 2006.

52.     On April 17, 2006, Khan purchased 200 April $20 Polycom call options at $1.35 per contract on the basis of the information Khan had received from Polycom Source, and between April 13 and 18, 2006, Rajaratnam purchased 250,000 Polycom shares on behalf of the Galleon Tech funds based on the information he had received from Khan.

17

53.     On April 19, 2006, Polycom's stock opened at $21.85 per share and began to climb in advance of the after-hours earnings release, closing at $22.52 per share. Following the market close on April 19, Polycom released its Q1 2006 earnings, which included higher-than-expected revenues. Later that day, Rajaratnam congratulated Khan for the Polycom tip. On April 20, 2006, Polycom opened at $22.72 per share. The Galleon Tech funds sold some of their Polycom shares in the stock price run-up prior to the announcement on April 19 and then sold the rest following the announcement for a profit of over $165,000. Khan sold her options on April 19 during the stock price run-up prior to the announcement, making a profit of $22,000.

**B.     Insider Trading in Hilton Securities**

54.     Khan obtained material nonpublic information in advance of a July 3, 2007 takeover announcement that a private equity group would be buying Hilton for $47.50 per share, a premium of $11.45 per share over the stock's July 3 closing price (the "Hilton Transaction"). Khan obtained the nonpublic information from Shah, a friend and roommate of Khan's cousin. At the time, Shah was working as an analyst at Moody's, a rating agency that was evaluating Hilton's debt in connection with the Hilton Transaction. Because of his position at Moody's, Shah had access to material nonpublic information about Hilton.

55.     On or about July 2, 2007, Shah provided Khan with specific information concerning the upcoming Hilton Transaction. Shah told Khan that Hilton was going to be taken private in a deal to be announced the following day, at a price around the mid-$40s per share. Shah indicated that he had learned this information through a communication that representatives of Moody's had received from Hilton management.

Immediately after receiving this information, Khan purchased 550 August $35 Hilton call option contracts at $1.07 per contract. The following morning, Khan purchased 100 July $35 Hilton call option contracts at $0.90 per contract.

56.     Also on or about July 2, 2007, Khan told Rajaratnam that Hilton was going to be taken private at a price somewhere in the mid-$40s per share in a deal to be announced the following day. Khan described the Hilton Transaction to Rajaratnam as a sure thing, and told Rajaratnam that she had a very good source for the Hilton information.

57.     After receiving the tip from Khan, on July 3, 2007, Rajaratnam and Galleon purchased 400,000 shares of Hilton for the Galleon Tech funds, whose stated purpose is to make investments in the technology sector.

58.     On the evening of July 3, the Hilton Transaction was announced at an $11.45 per share premium over that day's closing price of $36.05. On July 5, the first trading day after the July 4th holiday, Hilton shot up to $45.39 per share.

59.     On July 5, Khan sold all of the Hilton call option contracts that Khan had purchased on July 2 and 3 for a profit of over $630,000.

60.     To compensate Shah for the Hilton tip, Khan paid Shah $10,000 through an intermediary.

61.     The Galleon Tech funds sold their Hilton shares after the July 3 announcement for a profit of over $4 million.

62.     In addition, on July 3, 2007, Rajaratnam, or someone acting on his behalf, purchased 7,500 Hilton shares on behalf of Goel, using Goel's brokerage account held at

Charles Schwab & Co., Inc. (the "Schwab Account"). The shares were sold on July 6, 2007 for a profit of over $78,000.

63.     Khan also passed the tip Khan received from Shah about the Hilton Transaction to her friend, Tipper X, telling Tipper X on July 2, 2007 that Khan had learned from a source with inside information that Hilton would be acquired the next day at a significant premium. Tipper X traded profitably based on that information and also tipped Shankar, a proprietary trader at Schottenfeld, indicating to Shankar that the information was from an inside source. Shankar traded based on the Hilton tip, buying approximately 25,000 Hilton shares spread out over multiple accounts, including a Schottenfeld account Shankar managed as well as an account registered to a third party. After the announcement of the Hilton Transaction, Shankar sold the Hilton shares he had bought in the Schottenfeld account, making a profit of over $156,000.

64.     Shankar passed the Hilton tip that he received from Tipper X to associates at Schottenfeld, including Goffer. Shankar told Goffer that Hilton was about to be taken over and indicated that the information was from an inside source who, through Tipper X, had previously provided Shankar with inside information. Shankar and Goffer referred to the source as "the goose" (as in the goose that laid the golden egg) when speaking to each other. On July 3, 2007, Goffer purchased 5,000 Hilton shares and 510 call option contracts in a Schottenfeld account that he managed. Goffer also provided Shankar with $10,000 to pay "the goose" for the Hilton tip, although the money was ultimately used to pay for a different insider tip, which is discussed below. Goffer sold the Hilton shares he had purchased in the Schottenfeld account after the Hilton Transaction announcement, generating profits of approximately $329,000.

65.     On July 3, 2007, a total of 81,100 Hilton shares and 773 Hilton call options were purchased in various Schottenfeld accounts generating total cumulative profits from Shankar's tip of over $1.2 million.

## C.     Insider Trading in Google Securities

66.     Within a week of the Hilton tip, Khan obtained material nonpublic information from another source (the "Google Source") concerning Google's second quarter 2007 ("Q2 2007") results, which were scheduled to be announced after the close of the markets on July 19, 2007. The Google Source worked at Market Street Partners, a consulting firm that did investor relations work on behalf of various companies, including Google. As a result, the Google Source had access to material nonpublic information concerning Google's earnings announcements.

67.     On or about July 10, 2007, the Google Source told Khan that Google's earnings per share ("EPS") would be down about 25 cents, which was in sharp contrast to the market's expectation that Google's EPS would be strong. After receiving the Google tip from the Google source, beginning on July 12, 2007, and up until the day of the earnings announcement, Khan purchased a total of 566 August 2007 $530 Google put options.

68.     Shortly after receiving the Google tip from the Google Source, Khan passed the Google tip to Rajaratnam, telling him to short Google because earnings would fall below the analyst expectations. Khan told Rajaratnam that Khan's source for the tip was a consultant for Google who had pre-announcement access to earnings information.

69.     After receiving the tip from Khan, Rajaratnam began buying Google put options for the Galleon Tech funds and continued buying them through July 19. In

addition, Rajaratnam communicated with Khan before the markets opened on July 17, and shortly thereafter Rajaratnam communicated with the portfolio manager of the Galleon Captains funds. Beginning that same day and continuing through the day of Google's Q2 2007 earnings announcement, the Captains funds purchased Google put options, sold Google call options and sold short Google stock.

70.     After the markets closed on July 19, 2007, Google announced its Q2 2007 earnings results, disclosing, among other things, that its EPS was 25 cents lower than for Q1 2007. Google's share price fell from over $548 per share to almost $520 per share.

71.     Khan sold all of Khan's put options the day after the July 19, 2007 Google announcement for a profit of over $500,000.

72.     The Galleon Tech funds' profits from the Google tip were nearly $8 million, and the Galleon Captains funds made over $1.3 million. Thus, the combined profits generated by Rajaratnam and Galleon on behalf of the various Galleon funds from insider trading in Google on the basis of Khan's tip concerning Google's July 19, 2007 announcement exceed $9 million.

73.     After the Google Source provided Khan with the above information, the Google Source told Khan that unless Khan paid the Google Source a fee of $100,000-$200,000 per quarter the Google Source would cease providing Khan with inside information. Khan demurred and the Google Source stopped providing Khan with tips.

74.     On or about July 12, 2007, Khan also passed the material nonpublic information Khan received from the Google Source about Google's Q2 2007 results to Tipper X. Khan told Tipper X that Google would miss its quarter, and that the

22

information came from the Google Source, who worked at Google's investor relations firm.

75.     Tipper X traded profitably on the information and paid Khan $15,000 for the Google tip ($10,000 of which was money redirected from Goffer, who had provided it as payment for the Hilton tip, and $5,000 of which came from Shankar, as described below). Khan had intended to give the $15,000 from Tipper X and $15,000 of Khan's own money to the Google Source, but the Google Source subsequently refused to take Khan's calls. As a result, Khan kept the $15,000 provided by Tipper X.

76.     On or before July 18, 2007, Tipper X also passed the material nonpublic information Tipper X received from Khan about Google's Q2 2007 results to Shankar, telling Shankar that the information came from a source at Google's investor relations firm. Based on this information, before the announcement on July 19, 2007, Shankar sold short 2,000 Google shares and purchased 5 Google put option contracts in Schottenfeld proprietary accounts managed by Shankar. These transactions yielded profits of more than $50,000. Tipper X told Shankar that Tipper X needed to pay the source for the Google information and Shankar gave Tipper X $5,000 for that purpose.

77.     The Google Source also provided Lee with specific information about Google's Q2 2007 disappointing earnings prior to the issuance of Google's July 19, 2007 earnings release. The Google Source is a family friend of Lee's and Lee knew, at the time, that the Google Source was employed at Google's investor relations firm. Lee shared the information from the Google Source with Lee's business partner, Far, and Far and Lee traded based on the information in a joint account they held in the name of Far & Lee LLC. On the morning of July 19, 2007, before the earnings announcement, Far and

Lee caused Far & Lee LLC to purchase 200 July 2007 $540 Google put option contracts, a position they closed out after Google's announcement for a profit of over $390,000. In addition, Lee purchased Google put options in his personal account for a profit of over $71,000.

**D.** **Insider Trading in Kronos Securities**

78.     Khan also received inside information, which Khan traded on and passed on to others, concerning the acquisition of software company Kronos by private equity firm Hellman & Friedman ("Hellman") in March 2007 (the "Kronos Transaction").

79.     On March 23, 2007, Kronos announced, at market open, that it would be taken private by Hellman.

80.     During mid-March 2007, Shah learned from a friend (the "Kronos Source") that Kronos was on the auction block and was about to be acquired. The Kronos Source and Shah communicated several times on March 14, 2007, and the Kronos Source relayed specific information concerning a bid to acquire Kronos. Shah and Khan also communicated several times on March 14, and Shah provided Khan with material nonpublic information concerning the Kronos Transaction. Khan, in turn, tipped Tipper X to this information.

81.     On March 16, 2007, Khan purchased 35 April $40 Kronos call options at $3.00 per contract on the basis of the inside information Khan received from Shah.

82.     Following the March 23, 2007 announcement that Kronos was being acquired for $55 per share, Kronos' stock price increased nearly 14%, from $46.63 per share on March 22 to $53.11 per share at the market close on March 23. After the

announcement, Khan sold all of the call options she had bought on March 16 for a profit of approximately $37,000.

83.     Shah asked Khan to pay him $10,000 for the Kronos tip, and Khan, in turn, arranged for her tippee, Tipper X, to make the payment to Shah.

84.     On or about March 15, 2007, Khan told Tipper X that Kronos would be acquired in about a week for a substantial premium, and also told Tipper X about the source of the tip, and that the source wanted to be paid $10,000 for the tip. Tipper X traded profitably based on the information and also personally paid Shah $10,000 in cash for the Kronos tip.

85.     Tipper X passed the Kronos tip, including information about the source, to Shankar, and asked Shankar whether he could get Shankar's Schottenfeld colleague, Goffer, to provide the $10,000 that had been requested for the tip. Shankar tipped Goffer to the Kronos Transaction and Goffer agreed to pay the $10,000, leaving the cash in a bag in Shankar's desk drawer.

86.     Shankar purchased 7,500 Kronos shares on March 19 and 20, 2007, in a Schottenfeld account that Shankar managed and then sold them after the March 23 announcement of the Kronos Transaction for a profit of over $78,000.

87.     Goffer began purchasing Kronos shares on March 19, 2007, in a Schottenfeld account that Goffer managed, and held 19,000 Kronos shares heading into the March 23 announcement of the Kronos Transaction. The shares were sold after the announcement for a profit of approximately $200,000.

88.     Shankar passed the Kronos tip to Plate, another Schottenfeld colleague, and asked Plate to provide $5,000 that would be used to pay the source of the

25

information. Plate paid Shankar the $5,000 although Shankar did not end up providing this money to the source.

89.     Plate began purchasing Kronos shares on March 20, 2007, in a Schottenfeld account that Plate managed, and held 10,000 Kronos shares heading into the March 23 announcement of the Kronos Transaction. The shares were sold after announcement for a profit of approximately $90,000.

90.     Shankar, Goffer, and/or Plate passed the material nonpublic information they received about Kronos to others at Schottenfeld. All told, 14 Schottenfeld accounts purchased shares in Kronos ahead of the March 23 announcement, realizing total cumulative profits of over $800,000.

**E.** **Insider Trading in Intel Securities**

91.     On several occasions, Rajaratnam obtained material nonpublic information concerning Intel from defendant Goel, a managing director in Intel's treasury group and at Intel Capital. The treasury group is part of Intel's finance department and Intel Capital reports directly to Intel's President & Chief Executive Officer.

**(a)** **Intel's Q4 2006 Earnings Release – January 16, 2007**

92.     Beginning on or about January 8, and continuing through January 16, 2007, Goel communicated to Rajaratnam material nonpublic information that Goel secured through his position at Intel about Intel's fourth quarter 2006 ("Q4 2006"), financial results and outlook.

93.     On January 8, 2007, approximately one week before Intel's scheduled Q4 2006 earnings announcement, Rajaratnam contacted Goel. The next day, on January 9, 2007, Rajaratnam purchased 1 million shares of Intel at $21.08 per share, and on January

26

11, 2007, Rajaratnam purchased an additional 500,000 shares at $21.65 per share on behalf of various Galleon Tech funds.

94. Goel and Rajaratnam communicated again multiple times over the Martin Luther King Day weekend that followed. On Tuesday, January 16, 2007, the day the markets reopened after the long weekend, Rajaratnam and Galleon abruptly shifted course with respect to Intel, selling the Galleon Tech funds' entire 1,500,000-share long position in Intel at $22.03 per share, and making a profit of a little over $1 million. Goel again contacted Rajaratnam that afternoon.

95. Later that day, after the markets closed, Intel released its Q4 2006 earnings. Although the company's earnings were slightly higher than analysts' projections, its guidance for future performance was below expectations.

96. As a result, Intel's stock price, which had closed at $22.30 per share, opened at $21.25 on January 17, 2007, down $1.05 per share, or nearly 5%. Goel contacted Rajaratnam three times that day. The Galleon Tech funds' combined loss avoidance as a result of the January 16 sell-off was approximately $1.4 million.

**II.    Intel's Q1 2007 Earnings Release – April 17, 2007**

97. The following quarter, Goel again provided Rajaratnam material nonpublic information concerning Intel's earnings and financial guidance. On or before April 9, 2007, approximately one week before Intel's scheduled Q1 2007 earnings announcement, Rajaratnam and Galleon began selling short Intel's stock. The funds sold short 1 million shares at $20.14 per share. Goel and Rajaratnam spoke with each other multiple times in the days leading up to the trades, including on April 9, 2007. Later that day, after Rajaratnam's communication with Goel, Khan communicated with Rajaratnam.

That night, Khan emailed the principal of another hedge fund: "Also spoke to Raj[aratnam] . . This is what I got . . . [Intel] dn 10% . . . "

98.     The next day, April 10, 2007, Rajaratnam and Galleon sold short a combined 150,000 Intel shares 'at $20.68 per share. On that day, Goel communicated with a member of Intel's IR department, who, at the time of the calls, was aware of Intel's quarterly earnings numbers. Goel and Rajaratnam communicated again on April 11 and 13, 2007. After the April 13 contact, Rajaratnam and Galleon reversed course and began covering the Galleon Tech funds' short positions in Intel, and purchased 500,000 Intel shares at $20.45 per share. Goel and Rajaratnam communicated again later that afternoon.

99.     On Saturday, April 14, 2007, Goel reached out again to his contact in Intel's IR department and then communicated with Rajaratnam. Then, on Monday, April 16, 2007, Goel repeatedly tried to contact Rajaratnam who was traveling in the Caribbean at the time. Shortly after Rajaratnam and Goel spoke, Rajaratnam contacted another portfolio manager for certain of Galleon hedge funds, including the Captain's Fund. Beginning immediately after that communication, the Galleon Tech funds purchased 500,000 Intel shares at $20.63 per share and covered their existing short position – 650,000 shares – at $20.61 per share. Also immediately after the communication, other Galleon funds, including the Galleon Captains Fund and Galleon Communications Fund, started covering their existing short positions in Intel, purchasing Intel shares, and selling Intel put options.

100.     On April 17, 2007, Rajaratnam and Galleon purchased 1,479,044 shares of Intel at prices ranging from $20.81 to $21.42 per share. Later that day, after the markets

closed, Intel released its Q1 2007 earnings, raising its profitability target for the rest of the year. Intel's share price, which had been $20.77 at the close, rose following the announcement, primarily due to Intel's improved outlook on profitability, which was based mainly on cost reductions rather than any increases in revenues or sales. In fact, Intel's revenues were down 9% compared with Q4 2006, which ties closely with what Rajaratnam had told Khan, as reflected in Khan's April 9, 2007 communication.

101.    In sum, Rajaratnam and Galleon established a sizable short position in Intel after Rajaratnam learned of Intel's lower revenue numbers from Goel on or around April 9, but then changed course and took a long position after Goel told Rajaratnam, on or around April 13, that Intel would be raising its profitability target for the rest of the year. The Galleon funds profited on the above trades by approximately $1.3 million, and avoided losses of approximately $917,000.

### III.    Intel's Q3 2007 Earnings Release – October 16, 2007

102.    In connection with Intel's third quarter release, Goel once again gave Rajaratnam material nonpublic information concerning Intel's earnings and financial guidance and Rajaratnam and Galleon traded based on the information. On October 8, 2007, a week or so before Intel's scheduled Q3 2007 earnings announcement, Goel contacted Rajaratnam. Two days later, on October 10, 2007, Rajaratnam and Galleon purchased 500,000 Intel shares at an average price of $25.82 per share.

103.    On October 15, 2007, the day before Intel's earnings announcement, Goel and Rajaratnam communicated again. The following day, Rajaratnam and Galleon purchased an additional 450,000 Intel shares at $25.74 per share. After the markets closed that day, Intel released its Q3 2007 earnings, raising guidance and reporting

revenues and earnings that beat expectations. Following the announcement, Intel's share price, which had closed at $25.48 on October 16, opened on October 17 at $26.79 per share, up more than 5%. On October 17, Goel communicated with Rajaratnam, and Rajaratnam and Galleon sold the 950,000 Intel shares that they had acquired, at a price of approximately $26.73 per share, realizing a profit of over $690,000.

**F.      Insider Trading in Clearwire Securities**

104.    Goel, who is a managing director at Intel Capital, an Intel subsidiary that invests in technology companies, also tipped Rajaratnam about a joint venture between Clearwire and Sprint through which the two companies combined their wireless broadband, or WiMAX, businesses to form a new wireless communications company (the "Clearwire Transaction").

105.    The Clearwire Transaction was publicly announced on May 7, 2008. Intel Capital, which was Clearwire's largest shareholder, owning about a 20% stake and having representation on Clearwire's Board at the time of the deal, invested $1 billion in the Clearwire-Sprint joint venture. According to press reports, the investment was Intel Capital's largest ever.

106.    Between early February 2008 and May 2008, Rajaratnam caused the Galleon Tech funds to engage in three rounds of Clearwire trading, all in close proximity to communications between Goel and Rajaratnam. In all three rounds, the Galleon Tech funds traded in advance of news reports relating to the deal between Clearwire and Sprint based on material nonpublic information about the Clearwire Transaction that Goel obtained through his employment at Intel and provided to Rajaratnam.

107. First, the Galleon Tech funds began building a long position in Clearwire on February 8, 2008 (continuing through February 14) of 375,350 shares following several timely contacts between Goel and Rajaratnam, including on the morning of February 8. On February 15, after multiple media outlets reported rumors that Clearwire and Sprint might revive a previously announced but abandoned plan to combine their wireless broadband businesses and announce a deal in the next few days (sending Clearwire's stock price up over 5%), the Galleon Tech funds began to liquidate their position.

108. Then, on March 19 and 20, 2008, Goel and Rajaratnam communicated repeatedly. In the course of these communications, Goel provided Rajaratnam with material nonpublic information about the Clearwire Transaction which Goel obtained through his employment at Intel. On the next trading day after the calls, Monday, March 24, the Galleon Tech funds again began to build a long position in Clearwire, purchasing 125,800 shares. Goel and Rajaratnam communicated again on March 24 and Goel provided Rajaratnam with additional material nonpublic information concerning the Clearwire Transaction. On March 25, Rajaratnam caused the Galleon Tech funds to buy another 136,000 Clearwire shares. After the close of the markets that day, the media reported that Clearwire had created a severance plan for its employees in the event of a takeover, again fueling speculation that Clearwire was close to striking a deal with Sprint. On March 26, Clearwire's share price opened at $15.85 per share, up about 18% from the previous day's closing price.

109. On March 26, multiple media outlets reported that Clearwire and Sprint might get funding for the rumored joint venture from two major cable companies,

sending Clearwire's share price up almost 6% by the end of the trading day. That same day, Rajaratnam caused the Galleon Tech funds to begin to sell the Clearwire shares they had accumulated, selling 68,000 Clearwire shares. Rajaratnam and Goel communicated again on April 1 and April 2, 2008. On April 2, Rajaratnam caused the Galleon Tech funds to sell 44,200 Clearwire shares. On April 15, 2008, Goel communicated to Rajaratnam that things were not happening as planned with respect to the Clearwire Transaction. On April 18, Rajaratnam liquidated the Galleon Tech funds' Clearwire position, selling the remaining 149,600 shares.

110.   Rajaratnam again established a long position in Clearwire on behalf of the Galleon tech funds on May 6, 2008, the day before the Clearwire Transaction was announced, purchasing 290,750 shares. The trades were once again preceded by contact between Goel and Rajaratnam (on April 20, 23, and 30). Clearwire's stock price jumped almost 9% on May 7 in the wake of the announcement, before declining over the course of the day to close down 1.46%. The Galleon Tech funds sold roughly half their Clearwire holdings for a sizeable profit on May 7, liquidating their remaining holdings by May 27.

111.   Overall, the Galleon Tech funds realized illicit gains of over $780,000 on their Clearwire trading between February and May 2008.

### G.   Insider Trading in PeopleSupport Securities

112.   Rajaratnam traded on the basis of material nonpublic information concerning PeopleSupport on behalf of Goel.

113.   During 2008, Galleon had regular access to inside information about PeopleSupport, a back office outsourcing company, because Galleon was a 25% owner of

the company, and because a managing director at Galleon (the "Galleon Designee") served on PeopleSupport's Board of Directors.

114. The Galleon Designee communicated material nonpublic information about PeopleSupport that the Galleon Designee learned through the Galleon Designee's service on PeopleSupport's Board of Directors to Rajaratnam, including information concerning the acquisition of PeopleSupport by Aegis BPO Services Ltd. ("Aegis").

115. On two separate occasions during 2008, Rajaratnam purchased securities of PeopleSupport through Goel's personal Schwab Account based on material nonpublic information. First, Rajaratnam purchased 30,000 shares in advance of PeopleSupport's August 4, 2008 announcement that PeopleSupport would be acquired by Aegis. These shares were sold for a profit of about $102,000 after PeopleSupport's share price spiked 25% in response to the merger announcement.

116. Second, on the afternoon of October 7, 2008, in advance of PeopleSupport's October 8, 2008 announcement that the merger with Aegis was confirmed (PeopleSupport had announced the prior morning that it had received a request to delay the merger, which sent prices down amidst investor concerns that the deal might be in jeopardy), Rajaratnam purchased 30,000 PeopleSupport shares for Goel's Schwab Account. Rajaratnam communicated with Goel on October 7, indicating to Goel that Rajaratnam knew by virtue of the Galleon Designee's position on PeopleSupport's Board that the deal was going to close later in October and that he had purchased the shares for Goel in the Schwab Account. The shares were sold after the October 8 announcement for a profit of about $48,000.

## H.    Insider Trading in Akamai Securities

117.    An executive at the internet services company Akamai and a family friend of Chiesi's (the "Akamai Source"), provided material nonpublic information about Akamai's disappointing Q2 2008 earnings results and guidance concerning future performance to Chiesi in advance of Akamai's July 30, 2008 earnings release and earnings conference call (the "Q2 2008 Earnings Announcement"). Specifically, the Akamai Source told Chiesi that Akamai would guide down and that the consensus among Akamai's management was that Akamai's stock price would decline in the wake of the Q2 2008 Earnings Announcement.

118.    In its Q2 2008 Earnings Announcement on July 30, 2008, Akamai announced results that missed both the consensus sales estimate and the consensus revenues forecast. Akamai also announced earnings and revenues forecasts that were below consensus estimates. Following the announcement, Akamai's stock declined nearly 20%, from $31.25 per share on July 30 to $25.06 per share on the day after the announcement.

119.    Chiesi communicated with the Akamai Source numerous times, and also traded profitably in Akamai on behalf of the New Castle funds, prior to the Q2 2008 Earnings Announcement. Specifically, Chiesi and the Akamai Source spoke multiple times between July 2 and July 24, 2008, and had two lengthy discussions on July 24, 2008. Immediately following the second of these discussions, Chiesi communicated the material nonpublic information she had learned from the Akamai Source to Kurland. On the following day, July 25, the New Castle funds sold short shares of Akamai, adding to its short positions through July 30, 2008. In the day or so before Akamai's Q2 2008

Earnings Announcement, Chiesi had two additional calls with the Akamai Source. On July 30, New Castle purchased 1,466 Aug 2008 $30 Akamai put options. Following the Q2 2008 Earnings Announcement, the New Castle funds covered their combined Akamai short position, which had grown to almost 290,000 shares, and sold their Akamai puts, generating profits of approximately $2.4 million.

120.    In addition to trading Akamai shares for the New Castle funds based on the tip from the Akamai Source, Chiesi also passed the Akamai Source's tip to Rajaratnam and Galleon, and also to Fortuna and S2 Capital.

121.    Chiesi and Rajaratnam communicated numerous times on July 23 and 24, 2008, including immediately before and after Chiesi spoke with the Akamai Source. Just after speaking to the Akamai Source on July 24, Chiesi told Rajaratnam that she learned from the Akamai Source that Akamai was going to guide down and that people at Akamai were saying that Akamai's stock price was going to decline to $25.00 per share based on the Q2 2008 Earnings Announcement. Chiesi made clear to Rajaratnam that her source was an insider at Akamai. On the day following this spate of communications, July 25, 2008, Rajaratnam dramatically increased the Galleon Tech funds' existing short position in Akamai, selling short 138,550 Akamai shares. On July 29, Rajaratnam sold short another 173,300 Akamai shares on behalf of the Galleon Tech funds. Then, on the morning of July 30, 2008, the day of the Q2 2008 Earnings Announcement, Rajaratnam contacted Chiesi. Shortly thereafter, Chiesi communicated with the Akamai Source and then communicated with Rajaratnam again. On July 30, Rajaratnam increased the Galleon Tech funds' short positions yet again, selling short another 211,650 Akamai shares. Following the announcement, Rajaratnam closed out the Galleon Tech funds'

half-million-share short position and put options for a combined profit of over $3.2 million.

122. On the morning of Friday, July 25, after Chiesi had communicated with the Akamai Source the night before, Chiesi passed the Akamai tip to Fortuna, telling Fortuna that Akamai would guide lower and that the consensus among Akamai's management was that the Q2 2008 Earnings Announcement would drive Akamai's stock price down. Chiesi made clear to Fortuna that the information was nonpublic and that the source of the inside information was someone at Akamai. Based on Chiesi's tip, Fortuna began shorting Akamai stock and purchasing puts on that same day for S2 Capital's "Tech" account, increasing the short and put positions through the July 30, 2008 Q2 2008 Earnings Announcement. After the announcement, Fortuna covered S2 Capital's entire Akamai short position of 375,000 shares and sold the remaining Akamai put option contracts for a profit of approximately $2.4 million.

## I.    Insider Trading in SUN Securities

123. Moffat, IBM's Senior Vice President and Group Executive, Systems and Technology Group, conveyed to Chiesi material nonpublic information about SUN's Q2 2009 results in advance of SUN's January 27, 2009 earnings release.

124. In January 2009, IBM was conducting due diligence on SUN in contemplation of a possible acquisition of SUN by IBM. Pursuant to a confidentiality agreement between IBM and SUN entered into as part of the acquisition process, SUN provided IBM with its Q2 2009 earnings results in advance of the January 27, 2009 earnings announcement. Because of his role in IBM's due diligence of SUN, Moffat had access to SUN's earnings results.

125.     Chiesi and Moffat, who are friends, contacted each other numerous times during January 2009, with the frequency of contact between the two increasing significantly just prior to the SUN earnings release.

126.     Moffat was one of a group of IBM executives on the preliminary due diligence team arriving at a designated location to conduct due diligence on SUN on January 19, 2009. Moffat contacted Chiesi at home that evening, and had several conversations with her over the next several days. In the course of one or more of these conversations, Moffat provided Chiesi with material nonpublic information concerning SUN's Q2 2009 earnings. In addition, on January 22, 2009, a draft of SUN's earnings results was conveyed to the IBM due diligence team.

127.     On Monday, January 26, 2009, Chiesi told a third party that her IBM source had indicated to her that SUN would announce the next day that its "top," or quarterly revenue, and "bottom," or earnings per share, would exceed analysts' consensus expectations, and that the revenue number would be "3.2 [billion]," and that her source knew this because IBM was doing due diligence on SUN.

128.     On January 26, 2009, Chiesi began acquiring a substantial long position in SUN on behalf of New Castle. On January 27, 2009, after the market closed, SUN reported its Q2 2009 earnings information. SUN's performance substantially exceeded consensus estimates, including higher revenue ($3.22 billion) and margins, posting a $0.02 per share profit whereas consensus estimates called for a loss of $0.09/0.10 per share. SUN's share price rallied on the news, rising 21%, from a January 27 closing price of $3.99 per share to a January 28 closing price of $4.86 per share, generating profits of nearly $1 million for New Castle.

129.    On January 28, 2009, Moffat transmitted to SUN, on behalf of IBM, a preliminary proposal to acquire SUN.

**J.    Insider Trading in AMD Securities**

130.    On October 7, 2008, AMD announced a spin off of its semiconductor manufacturing operations into a joint venture with Advanced Technology Investment Company, an investment company formed by the government of Abu Dhabi. AMD also announced that an Abu Dhabi sovereign wealth fund, Mubadala Investment Co., would be investing $314 million in AMD. Both deals were publicly announced prior to the market open on October 7, 2008 (collectively, the "AMD Transactions").

131.    Kumar, a director at McKinsey, as well as a friend of Rajaratnam's and a direct or indirect investor in one or more funds managed by Galleon, provided material nonpublic information to Rajaratnam about the AMD Transactions prior to the October 7, 2008 public announcement concerning those transactions.

132.    Moffat and an AMD executive ("AMD Executive") also provided material nonpublic information to Chiesi about the AMD Transactions prior to the October 7, 2008 public announcement concerning the AMD Transactions. Chiesi shared material nonpublic information about the AMD Transactions with Kurland and Fortuna.

133.    Prior to the October 7, 2008 announcement of the AMD Transactions, Rajaratnam and Chiesi exchanged material nonpublic information they received from their respective sources about the transactions. Chiesi tipped Kurland to material nonpublic information about the AMD Transactions that she received from Rajaratnam.

134.    In or about June 2008, AMD entered into exclusive negotiations with the Abu Dhabi-based investors concerning the AMD Transactions. Beginning on June 1,

2008, McKinsey began advising AMD in connection with AMD's negotiations with the two Abu Dhabi sovereign entities. Kumar was one of the individuals at McKinsey knowledgeable about the negotiations, having first been contacted about the matter on June 1, 2008.

135.    IBM was involved in the AMD Transactions because the new, separate manufacturing entity that was being created sought to license certain technology from IBM. Moffat was one of the employees at IBM participating in discussions and meetings relating to the AMD Transactions.

136.    Kumar and Rajaratnam communicated numerous times concerning the AMD Transactions. On August 14, Kumar learned that the parties to the AMD Transactions had decided to proceed with the deal, and on August 15 Kumar conveyed this material nonpublic information to Rajaratnam. That day, Rajaratnam and Galleon dramatically increased their long position in AMD by purchasing over 2.5 million AMD shares as well as call options on behalf of various Galleon funds, and continued to build their long position up until just days before the announcement of the AMD Transactions. On September 11, 2008, Kumar communicated to Rajaratnam that the deals were on track and that the announcement of the AMD Transactions would be the first week of October. Various Galleon funds continued to trade AMD based on the inside information Rajaratnam had received from Kumar, including a purchase of approximately 4 million AMD shares on September 25 and 26. On the evening of September 29, Kumar left a voice message for Rajaratnam indicating that he had the information that Rajaratnam wanted. The next day, Rajaratnam communicated with Chiesi and indicated that the date for the announcement of the AMD Transaction was October 7, 2008. That same day,

Rajaratnam and Galleon purchased several hundred thousand more AMD shares in various Galleon funds, and then purchased over 1.5 million more AMD shares on October 3, 2008.

137. Meanwhile, on August 12 and 13, 2008, Chiesi communicated multiple times with the AMD Executive. On August 15, Rajaratnam communicated with Chiesi. Chiesi told Rajaratnam that she was hearing from her IBM source that the AMD Transactions would occur September 9 but the AMD Executive told her they would occur around mid-September. Chiesi's source at IBM for this information was Moffat. Rajaratnam informed Chiesi that the parties shook hands on the deals the day before. Shortly after Chiesi's communication with Rajaratnam, Chiesi communicated with Kurland, passing along material nonpublic information about AMD that she received from Moffat and the AMD Executive. Kurland cautioned Chiesi to be careful and to avoid putting anything in an email. Kurland also told Chiesi to purchase AMD shares on behalf of New Castle. Later that day, Chiesi communicated with Moffat and Moffat provided Chiesi with numerous details about the AMD Transactions. On or about August 15, Chiesi and Kurland bought approximately 200,000 AMD shares on behalf of New Castle.

138. From approximately August 22 to approximately September 22, 2008, Chiesi learned from Moffat additional material nonpublic information about the AMD Transactions. During this time period and throughout, Kurland received regular updates on the transactions, either indirectly from Chiesi, or directly by listening in on some of her communications with Moffat.

139.    From approximately August 19 to approximately September 16, 2008, Chiesi had numerous communications with the AMD Executive during which the AMD Executive tipped Chiesi to additional nonpublic information about the AMD Transactions. Chiesi passed material inside information she received from the AMD Executive about the AMD Transactions to Kurland.

140.    Between August 19 and September 30, 2008, Chiesi and Rajaratnam had numerous communications during which they exchanged material nonpublic information about the AMD Transactions that they received from their respective sources. Chiesi passed at least some of the inside information she received from Rajaratnam about the AMD Transactions to Kurland. For example, shortly after Rajaratnam told Chiesi on September 30 that the transaction would be announced on October 7, Chiesi passed this information to Kurland.

141.    Chiesi and Kurland built a sizeable long position in AMD on behalf of New Castle between August 15 and September 30, 2008, including a purchase of approximately 127,600 AMD shares on September 30.

142.    On or before August 15, 2008, Chiesi tipped Fortuna to the material nonpublic information she received from her various sources about the AMD Transactions. Fortuna communicated multiple times with Chiesi between August 12 and 15. Fortuna purchased 40,000 AMD shares on behalf of S2 Capital on August 15, and then continued to build a large long position in AMD right up until the October 7 announcement.

143.    AMD's stock price increased by about 24.6% in the aftermath of the announcement of the AMD Transactions, opening at $5.27 per share on October 7 after

closing the day before at $4.23 per share. However, because the worldwide economic crisis sent stock prices, including AMD's, tumbling in September and October 2008, AMD's share price was lower following the October 7 announcement that it was when the various Galleon, New Castle and S2 Capital funds had begun accumulating much of their respective AMD positions in August. Nevertheless, the funds' investments increased significantly on the news of the AMD Transactions – for instance, the aggregate value of Galleon's position in AMD increased by approximately $9.5 million from October 6 to October 7, 2008.

**K.    Insider Trading in IBM Securities**

144.    Moffat provided Chiesi with material nonpublic information concerning IBM's quarterly financial results, including IBM's Q4 2008 earnings release, and Chiesi traded on behalf of New Castle based on that information.

145.    Prior to January 8, 2009, New Castle had accumulated a 177,000 share short position in IBM stock. On January 8, 2009, Moffat and Chiesi communicated twice. The following day, January 9, 2009, Chiesi began to cover New Castle's short position. All told, between January 9 and January 15, 2009, Chiesi covered New Castle's entire 177,000 share short position and then built a long position in the same amount, 177,000 shares.

146.    Chiesi and Moffat communicated again on January 19, 2009. On January 20, 2009, Chiesi added to New Castle's long position, purchasing approximately 45,200 shares of IBM stock, at a price of approximately $82.72 per share. That day, Chiesi indicated to an employee of another hedge fund that her IBM contact told her that IBM

could add 30 cents to its bottom line guidance for its 2009 fiscal year. She also indicated that IBM could beat analyst estimates for the quarter.

147. On or about January 20, 2009, following the close of the market, IBM announced its earnings for the quarter ending in December 2008. Earnings per share were $3.28, which beat analysts' consensus expectations of $3.03. Moreover, IBM announced that it expected earnings per share in 2009 of at least $9.20, which was 27 cents more than IBM's earnings per share in 2008 ($8.93), and higher than analysts' expectations of $8.75.

148. On January 21, 2009, IBM stock opened at $86.29 per share, up $4.31 (approximately 5%) over the previous day's closing price of $81.98 per share. Between January 21, 2009 and January 30, 2009, New Castle sold approximately 109,000 shares of IBM stock, at prices ranging from $88.83 to $93.24 per share, for a profit of approximately $715,000. Additionally, New Castle avoided losses of approximately $1.02 million from its short covers based on the January 8 communication Chiesi had with Moffat.

## L.     Insider Trading in Atheros Securities

149. Hariri, a Vice-President at the semiconductor company Atheros, tipped Far, a principal at Spherix Capital, in advance of Atheros's December 17, 2008 earnings pre-announcement and February 2, 2009 Q4 2008 earnings announcement. Far knew Hariri through Far's mother-in-law, and Far and Hariri regularly exchanged inside information. Hariri regularly gave Far information related to Atheros's revenues, gross margins and guidance. In exchange, Far provided Hariri with inside information on other companies, which information Hariri then used to trade for his personal gain.

150.    After the market close on December 17, 2008, Atheros announced that it was cutting its Q4 2008 earnings guidance in half, to between $0.14 and $0.19 per share, on anticipated revenue of $95 million to $100 million. Hariri told Far about the negative announcement on the morning of December 17, 2008, hours before the announcement was disclosed to the public. Within minutes of being told about the announcement, Far sold short 331,017 Atheros shares on behalf of Spherix Capital's Elliptical Master Fund Ltd. (the "Elliptical Master Fund"). The negative news was announced after the market closed that day, and the following day Atheros's stock opened and traded lower, eventually closing at a price down 17.56%. Far covered the Elliptical Master Fund's short sales after the announcement, making a profit of approximately $480,000.

151.    Far shared the tip he received from Hariri about Atheros's December 17, 2008 pre-announcement with Lee, his partner and a co-principal at Spherix Capital. Lee knew that Far was receiving material nonpublic information from an inside source at Atheros and was trading based on the information on behalf of Spherix Capital.

152.    On February 2, 2009, after the market close, Atheros issued its Q4 2008 earnings release, reporting sales and profits that were slightly better than analysts' expectations. Hariri and Far began communicating about the release as early as January 8, 2009. That same day, Far, who had begun to gradually build a long position in Atheros in the Elliptical Master Fund shortly after covering its short sales following the December 17, 2008 pre-announcement, caused the fund to purchase an additional 80,000 Atheros shares. Far then caused the fund to increase its long position by a total of 40,000 shares between January 9 and January 27.

153. On February 2, 2009, after the market close, Atheros issued its Q4 2008 earnings release, reporting sales and profits that were better than analysts' expectations. Hariri began providing Far with material nonpublic information concerning Atheros's Q4 2008 financial results on or before January 5, 2009. On January 5, Far increased the Elliptical Master Fund's position in Atheros and purchased an additional 70,000 Atheros shares. Far and Hariri communicated multiple additional times between January 5 and the February 2 announcement, and Far continued to build the fund's long position in Atheros leading up to the announcement, accumulating an approximately 900,000 share position heading into the announcement. After the announcement, Atheros's stock rose 6.7% from its February 2 closing price of $12.09 per share to close at $12.90 per share on February 3. Far sold off much of the fund's long position in Atheros in the days after the announcement, generating a profit of over $390,000 on the fund's post-January 4, 2009 Atheros stock purchases based on material nonpublic information provided by Hariri.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against all Defendants)

154. The Commission realleges and incorporates by reference paragraphs 1 through 153, as though fully set forth herein.

155. The information concerning (i) the Polycom January 25 and April 19, 2006 earnings announcements, (ii) the Hilton Transaction, (iii) the Google July 19, 2007 earnings announcement, (iv) the Kronos Transaction, (v) the Intel January 16, April 17 and October 16, 2007 earnings announcements, (vi) the Clearwire Transaction, (vii) the PeopleSupport Merger Announcements, (viii) the AMD Transactions, (ix) the Akamai

July 30, 2008 earnings announcement, (x) the SUN January 27, 2009 earnings announcement, (xi) the IBM January 20, 2009 earnings announcement, and (xii) the Atheros December 17, 2008 earnings pre-announcement and February 2, 2009 earnings announcement, respectively, was, in each case, material and nonpublic. In addition, the information was in each case considered confidential by the companies that were the ultimate source of the information, and each of these companies had policies protecting confidential information.

156.    Each of the Polycom Source, Shah, the Google Source, the Kronos Source, Goel, Kumar, the Akamai Source, Moffat, the AMD Executive and Hariri learned the material nonpublic information each conveyed during the course of their employment, and each knew, recklessly disregarded, or should have known, that each, directly, indirectly or derivatively, owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

157.    Each of the Polycom Source, Shah, the Google Source, the Kronos Source, Goel, Kumar, the Akamai Source, Moffat, the AMD Executive and Hariri tipped material, nonpublic information to their respective tippee(s) with the expectation of receiving a benefit.

158.    In connection with the purchase or sale of securities, each of Khan, Rajaratnam, Tipper X, Shankar, Goffer, Plate, Lee, Far, Chiesi, Kurland and Fortuna knew, recklessly disregarded, or should have known, that the material non-public information each received from their respective tippers was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

159. Each of Shah, Khan, Chiesi, Tipper X, Shankar, Far and Lee tipped their respective tippees material non-public information, with the expectation of a benefit therefrom, and each knew, recklessly disregarded, or should have known, that the information was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

160. Rajaratnam learned of the information concerning the merger of PeopleSupport through Galleon's representation on PeopleSupport's Board of Directors. Rajaratnam knew, recklessly disregarded, or should have known, that he, directly, indirectly or derivatively, owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to PeopleSupport to maintain such information in confidence and to not trade on it.

161. Rajaratnam, Galleon, Far, Lee, Spherix Capital, Chiesi, Kurland, New Castle, Fortuna and S2 Capital, are liable for the trading occurring in the funds advised – directly or indirectly – by each, respectively, because each effectuated the trades on behalf of the funds, controlled the funds and/or unlawfully tipped the inside information to the funds.

162. The unlawful trading done by Rajaratnam, Shankar, Plate, Goffer, Far, Lee, Chiesi, Kurland and Fortuna, respectively, is imputed or attributable to Galleon, Schottenfeld, Spherix Capital, Far & Lee LLC, New Castle, and S2 Capital, respectively.

163. By virtue of the foregoing, each of the Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue

statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

164. By virtue of the foregoing, each of the Defendants directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## CLAIM II
### Violations of Section 17(a) of the Securities Act
**(Against Galleon, Rajaratnam, Goel, Chiesi, Kurland, New Castle, Khan, Far, Lee, Far & Lee, Spherix Capital, Hariri, Shankar, Schottenfeld, Fortuna and S2 Capital)**

165. The Commission realleges and incorporates by reference paragraphs 1 through 164, as though fully set forth herein.

166. By virtue of the foregoing, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, each of Galleon, Rajaratnam, Goel, Chiesi, Kurland, New Castle, Khan, Far, Lee, Far & Lee, Spherix Capital, Hariri, Shankar, Schottenfeld, Fortuna and S2 Capital: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

167. By reason of the conduct described above, Galleon, Rajaratnam, Goel, Chiesi, Kurland, New Castle, Khan, Far, Lee, Far & Lee, Spherix Capital, Hariri, Shankar, Schottenfeld, Fortuna and S2 Capital, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining each of the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently restraining and enjoining Galleon, Rajaratnam, Goel, Chiesi, Kurland, New Castle, Khan, Far & Lee LLC, Spherix Capital, Far, Lee, Hariri, Schottenfeld, Shankar, S2 Capital, Fortuna, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)];

### III.

Ordering each of the Defendants to disgorge, with prejudgment interest, all illicit trading profits, other ill-gotten gains received, and/or losses avoided as a result of the

conduct alleged in this Complaint, including, as to each of the Defendants, their own illicit trading profits, other ill-gotten gains, and/or losses avoided, and the illicit trading profits, other ill-gotten gains, and/or losses avoided of their direct and downstream tippees.

## IV.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section 21(d)(3) and/or Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1], and Section 20(d) of the Securities Act [5 U.S.C. § 77t(d)];

## V.

Barring defendants Goel, Moffat and Hariri pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      November 5, 2009

David Rosenfeld
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153

Of Counsel:

Sanjay Wadhwa (WadhwaS@sec.gov)
Valerie A. Szczepanik (SzczepanikV@sec.gov)
David Stoelting (StoeltingD@sec.gov)
Israel Friedman (FriedmanI@sec.gov)
Jason E. Friedman (FriedmanJ@sec.gov)
John Henderson* (HendersonJ@sec.gov)

* *not admitted in the S.D.N.Y.*